[Crim. No. 1075. First Appellate District, Division One.—February 26, 1923.]

## THE PEOPLE, Respondent, v. FRANK VACARELLA et al., Appellants.

[1] CRIMINAL LAW — MURDER — SUFFICIENCY OF EVIDENCE. — In this prosecution for the murder of a Chinaman during a tong war, the evidence is sufficient to sustain the conviction of the defendants.

[2] EVIDENCE—RECORD OF LONG-DISTANCE TELEPHONE CALL.—The record of a telephone company made by an operator in the regular course of business of receiving payment and charging for a long-distance call is admissible to show a communication between two points.

[3] CONSPIRACY—EVIDENCE—ACTS AND DECLARATIONS OF CO-CONSPIRATORS.—Where a defendant's connection with a conspiracy is established by other proof, the acts and declarations of co-conspirators is admissible against him.

APPEAL from a judgment of the Superior Court of Santa Cruz County. Benjamin K. Knight, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. B. Peckham, George Smith, V. A. Scheller and Chas. M. Cassin for Appellants.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

RICHARDS, J.—The appellants were tried for the murder of one Lam Gee, also known as Ah Lum, the trial resulting in a conviction of murder in the first degree, with a recommendation of life imprisonment. From said conviction defendants appeal.

At the time of the homicide there was a tong war between two Chinese tongs, known as the Hip Sing Tong and the Bing Kong Tong. The Hip Sing Tong was numerically superior in San Jose and the Bing Kong Tong was numerically superior in Watsonville. The strength of the rival tong was such that the members of the Bing Kong Tong

left San Jose and the members of the Hip Sing Tong left Watsonville. This was the situation in the latter part of February, 1922, Chinatown in each city being akin to an armed camp. In San Jose it developed that twenty-two or twenty-three guards were on duty to protect the members of its tong. The defendant, Munoz, had been a guard, and the brother of Vacarella was also employed as a guard in San Jose. It required guns and ammunition to equip these men, who acted as watchmen, day and night, and a great quantity of these guns and ammunition was supplied by Hommrich's gun-store of San Jose. A record was kept of the number of the various firearms and also the quantity and size of cartridges furnished. Among the firearms sold on February 15, 1922, was a Police Positive Special, No. 243,458, Colt revolver, the money for the purchase of which, as also for all the other arms and ammunition obtained on that date, was guaranteed by one Jew Chuck, known also as Sam Kee, one of the appellants and who was one of the principal leaders of the Hip Sing Tong.

On February 15, 1922, there was purchased by the Hip Sing Club, a subsidiary organization of the Hip Sing Tong, the address of which was used as the headquarters of the latter organization, from the Osen Motor Sales Company, a used Marmon automobile, six hundred dollars being paid in cash and a note signed by Jew Chuck for the remaining six hundred dollars. The defendants Vacarella and Munoz took this automobile and went to Watsonville, but it appears that the machine broke down en route and was towed to the Corner Garage in that city. These two defendants endeavored on a number of occasions to get a certain San Jose telephone number on the telephone. This number, San Jose 1367, it developed, was the number of the Hip Sing Tong, located at No. 7 Dupont Street, in the name of Jew Bick. The telephone calls it is conceded were made for the purpose of obtaining money to pay the garage bill at Watsonville for the repair of the Marmon car. The phone calls were productive of results, as Louis Vacarella, under date of February 21st, telegraphed thirty dollars to Albert Munoz. The telegraph company's receipt for this money was found upon the person of Sam Kee upon his arrest after the homicide.

Under date of February 21st there was purchased from the W. J. Benson Company, by one Wong Sing, a Hudson touring car, second-hand, license number 32340. Wong Sing's address was given as No. 7 Dupont Street, the same residence number as Sam Kee and headquarters of the Hip Sing Club and the Tong. The payment for said automobile was guaranteed by Sam Kee. The Hudson had been repainted and the body thereof shone brilliantly. The next heard of the Hudson car was that it had arrived at Watsonville and Munoz and Vacarella had possession of it. The story of these defendants as to how they knew the car was for them was conflicting and it is not definitely shown from their evasive testimony how the car arrived at Watsonville, but Louis Vacarella testified that he was asked by the defendants to "bring down the Hudson car." "He [referring to Munoz] told me to bring down the Hudson car and two demijohns." These statements were afterward qualified by the witness upon further questioning by counsel for defense. "A. Well they phoned down to bring my car but it was broke. Q. What car did you bring them? A. I brought down a Hudson." Numerous parties saw the defendants Munoz and Vacarella and identified them by their appearance, the clothes they wore and the Hudson car with the new coat of paint. In the afternoon of the 22d, at or about 3 o'clock, Vacarella and Munoz were observed eating in the California restaurant and the Hudson car was observed standing in front. A brother-in-law of the proprietor was looking at the machine, which he called "highly polished," when one of the defendants asked who he was. The proprietor asked if it was their car and they answered in the affirmative. At approximately 9:45 of this evening Lam Gee, the deceased, employed as chef at the Appleton Hotel in Watsonville, while returning from a Japanese poolroom in said city was accosted at the point on Rodriguez Street near the hotel, where his body was found, by an individual, supposed by the witness describing the occurrence to be an "Oriental." There was no actual witness to the homicide other than the parties to it, but a witness who had gone on up the street a few moments before and had passed a big black car testified that when but a short distance beyond it up Rodriguez Street a shot rang out and he turned to see what was going

on. In the meantime the party doing the shooting had fired two more shots. The witness stated that immediately "I see a man run across the street from Appleton side to that big car." The witness took notice of the person running across the street by the kind of coat he wore, identifying the coat of Munoz as one like it, which was a short, brown jacket with a sheep's-hide collar, having the appearance of a fur collar, which coat had been worn by Munoz on the trip and which he had on when later observed by the county officers. This party, who evidently did the shooting, was observed by this witness to run to the big car which started before he could board it and went rapidly up Rodriguez Street. The murderer disappeared through a vacant lot adjoining a church across the street in the direction of 3d Street, which parallels Rodriguez Street. It is significant that on 3d Street, and near the point where said party would come through from Rodriguez Street there was found a revolver and a number of cartridges. The revolver proved to be the Colt Police Positive Special which had been sold in San Jose on February 15th, just one week prior to the homicide, the payment for which had been guaranteed by Sam Kee. The cartridges were 38 specials, the bullets of which weigh 158 grains. Two of the bullets which caused the death of Lam Gee were weighed and proved to be 126 and 154 grains. The weight would indicate that both were fired from a 38-caliber revolver. The surgeon who made the autopsy on the body testified that the wound made by the other shot was of the same character and probably made by the same size pistol. Approximately two hours and twenty-five minutes after the homicide the Hudson car heretofore referred to, occupied by Munoz and Vacarella, was stopped outside of San Jose by the sheriff of Santa Cruz County and certain of his deputies. At this time the said occupants stated they had not been in Watsonville but were coming from Salinas. They were allowed to go to their homes in San Jose. Later they admitted having been in Watsonville but insisted they had left on the afternoon of the 22d.

[1] As to the defendants Vacarella and Munoz a review of the record would seem to establish beyond a doubt that they were the parties guilty of the homicide, there being a clear trail from the time they left San Jose until

their return on the 22d or early hours of the 23d, every
detail of their movements cementing the facts which, when
woven together, make a conclusion as to their guilt ir-
resistible. In view of the fact that practically the only
question presented on this appeal, as to them, is the suffi-
ciency of the evidence to sustain the conviction, we deem a
further discussion as to their connection with the case un-
necessary.

[2] The contention is made that data concerning certain
telephone calls was improperly received in evidence. In all
but two instances this data was supplied from the records
of the telephone company, taken in the ordinary course of
business. This went to show the name and location of
the party making the call and the name and telephone
number at the destination of said call. It was only to show
the communication between these points that the evidence
was admitted. We see no reason why the records of the
telephone company, taken in the regular course of business
and with its peculiar method of receiving payment there-
for and charging the revenue accordingly, especially to
long-distance calls, where it is necessary for the operator to
make a written record thereof, should not be allowed in
evidence. (*Sullivan* v. *Kuykendall*, 82 Ky. 483 [56 Am.
Rep. 901]; *Wolfe* v. *Missouri Pacific Ry. Co.*, 97 Mo. 473
[10 Am. St. Rep. 331, 3 L. R. A. 539, 11 S. W. 49].) The
two instances where the conversation over the telephone was
allowed was that overheard by those present at the garage
at the time the Marmon car was being repaired. This was
direct evidence of the statements and conversation of the
defendants Vacarella and Munoz and was undoubtedly ad-
missible against them; the only question being as to whether
or not it was admissible against Sam Kee. [3] It would
clearly be so admissible for the reason that Sam Kee's
connection with the conspiracy is established by other proof
and hence the acts and declarations of Vacarella and Munoz
in connection with these telephone calls and conversations
would be admissible against their co-conspirator. (*People*
v. *Collins*, 64 Cal. 293 [30 Pac. 847]; *People* v. *Oldham*,
111 Cal. 648 [44 Pac. 312]; *People* v. *Schmidt*, 33 Cal.
App. 445 [165 Pac. 555].)

As to the defendant Sam Kee the contention is raised that
the evidence is insufficient for his conviction. The question

of motive is raised by appellants, the argument being that there would seem to be no good reason for the defendants Munoz and Vacarella taking the life of Lam Gee. This motive is supplied by the connection of Sam Kee with the Hip Sing Tong, with these two defendants and with this killing showing that a potent reason not connected with Vacarella and Munoz was behind the homicide. It is a conceded fact that there was a tong war raging and that the members of the tongs involved departed from the enemy's camp in these two towns. It is also a fact that Lam Gee appeared to be totally unafraid to remain in Watsonville, indicating that he had nothing to fear from the Bing Kong Tong. There was testimony to the effect that Lam Gee was a member of the Bing Kong Tong and generally known to be such in Watsonville. There was also some evidence that he was a member of the Hip Sing Tong, but this testimony as to the deceased's membership in the Hip Sing Tong was vague and some of it went back thirteen to fifteen years and went merely to his presence on one or more occasions in the clubhouse of said tong in San Francisco. This testimony was given by three Chinese living at 7 Dupont Street, San Jose, members of the Hip Sing Tong, one of whom was the defendant Sam Kee himself and another of whom had departed from Watsonville when the "war" started. There is abundant evidence to show that the death of Lam Gee resulted from the activities of the Hip Sing Tong, between which and the defendants Munoz and Vacarella a close connection was established. As to the connection of the defendant Sam Kee with a conspiracy to take the life of Lam Gee, it must be remembered that he was one of the leaders of the Hip Sing Tong; that it was he who obtained the firearms and ammunition, among which was the pistol later found at Watsonville; that he supervised the purchase of the Marmon car, was present at the purchase of and guaranteed payment for the Hudson; the phone calls of Vacarella and Munoz came to his headquarters, and on him the receipt for the money sent to Albert Munoz in Watsonville was found, several days after the homicide. Taking the record as a whole it would seem clear that a conspiracy existed to take the life of Lam Gee, Munoz and Vacarella carrying the details into execution, and at every crucial point we find the defendant Sam

Kee in charge of the details of providing the materials, appliances, and facilities for the commission of the crime. The judgment is affirmed.

Tyler, P. J., and St. Sure, J., concurred.