[Crim. No. 1206.   First Appellate District, Division One.—June 1, 1926.]

THE PEOPLE, Respondent, v. J. J. EISEMAN et al., Appellants.

[1] CRIMINAL LAW — CORPORATE SECURITIES ACT — ORGANIZATION OF FOREIGN CORPORATION—PURCHASE OF STOCK—CONTRACT OF SALE—CONSTRUCTION — INTENT — INSTRUCTIONS. — Where persons in this state cause a corporation to be organized under the laws of another state and then purport to sell the stock of said corporation to one of their number under a contract which provides for future payment of the purchase price, and the object of such contract is not to provide for a legitimate sale and transfer of title to the stock, but to all intents and purposes is to create a mere fiction of law, constructed upon a collusive and fraudulent intent and design to violate and defeat the provisions of the California Corporate Securities Act, the transaction cannot be resolved into a legal contractual relationship so as to be controlled by legal rules of ownership applying to legitimate contracts of sale; and in a subsequent criminal prosecution, it is not error to instruct the jury that the effect of such contract was that title should not pass until the agreed purchase price was paid.

[2] ID.—FRAUDULENT CONTRACT—STATE AS INTERESTED PARTY.—Fraud vitiates all transactions into which it enters; and when such a contract is presented for recognition in this state, as being legally sufficient to place the parties claiming under it beyond the scope of the law of this state, the state itself becomes an interested party to the contract, to the extent at least of having the right to inquire into the bona fides of the transactions upon which the contract is founded.

[3] ID.—VIOLATION OF CORPORATE SECURITIES ACT—CONSPIRACY—EVIDENCE.—In this prosecution of several defendants for the crimes of conspiracy to violate and of having violated the California Corporate Securities Act in connection with the sale in this state of stock in a foreign corporation which stock was the subject of a prior purported sale by said foreign corporation to one of the defendants, the evidence was amply sufficient to establish the offenses of which the several defendants were convicted.

[4] ID.—CONSPIRACY—ACTS OF DEFENDANTS INDIVIDUALLY—EVIDENCE. In such prosecution, evidence which reasonably tended to connect

2.  See 12 Cal. Jur. 721; 12 R. C. L. 231.
4.  See  5 Cal. Jur. 522.

the different defendants with the conspiracy, or else amounted to statements, acts, declarations, or correspondence of defendants, or of their agents and employees, during the progress of the conspiracy and in aid of the common design and purpose thereof, was properly admitted after a foundation had first been laid by proof tending to establish the fact of such conspiracy; and such acts, statements, declarations, and correspondence were properly admitted as evidence against each member of the confederacy, although all the defendants were not always parties thereto.

[5] ID. — DEFECTIVE SEARCH-WARRANTS — ADMISSIBLE EVIDENCE. — Assuming that defendants' books, papers, and files were seized under defective search-warrants, that fact did not render the seized evidence inadmissible.

[6] ID.—ATTORNEY AT LAW AS DEFENDANT—TESTIMONY OF EMPLOYEE. The facts that one of the defendants was a licensed attorney at law of this state and that upon the door of his offices appeared wording showing they were his "Law Offices," did not disqualify one of his employees from testifying as to the identity and authenticity of correspondence, documents, and papers issued by and belonging to the files of the foreign corporation the sale of the stock of which was the cause of the criminal prosecution, where the duties of said employee were that of clerk, bookkeeper, and cashier for said corporation, and none of the knowledge regarding which she testified was acquired by or imparted to her in the capacity of a clerk, secretary, or stenographer of an attorney at law, and the business enterprises forming the basis of the criminal prosecution were not promoted by said defendant as an attorney at law.

[7] ID.—INSTRUCTIONS—REPETITION—ERRONEOUS THEORY — MISSTATEMENT OF LAW—LEGAL EFFECT OF CONTRACT.—In this prosecution for the crimes of conspiracy to violate and of having violated the California Corporate Securities Act in connection with the sale in this state of stock in a foreign corporation which stock was the subject of a prior purported sale by said foreign corporation to one of the defendants, the trial court did not err in refusing defendants' requested instructions which were substantially embodied in other instructions given, or which were offered in support of defendants' theory of a valid sale of the stock in a sister state, or which related to matters which were immaterial to the issues, or which contained some asserted principle of law which justified the refusal of the entire instruction; and it was

5. Property wrongfully seized by public authorities as evidence in criminal case, see notes in 11 A. L. R. 681; 13 A. L. R. 1168. See, also, 23 Cal. Jur. 180; 8 R. C. L. 196.

clearly within the province of the court to instruct the jury as to the legal effect of the purported contract of sale, leaving for decision the disputed question of fact as to whether or not there was a *bona fide* sale.

[8] ID.—CONSPIRACY — KNOWLEDGE OF VIOLATION — INTENT—BELIEF—INSTRUCTIONS.—In such prosecution, if the court's instruction that the question for the jury to pass upon was whether defendants "conspired to do the things which were in violation of law, not whether they had any knowledge that they were violating the law," was open to criticism when connected with the law of conspiracy, the jury could not have been misled where the court, as a part of the same instruction, also stated to the jury that mere association of individuals with an innocent purpose or with honest intent is not a conspiracy as defined by law, and that in determining the guilt of the defendants upon the conspiracy charge they should consider whether defendants "honestly entertained a belief that they were not committing a wrongful act" and whether or not they "were acting under a misconception or in ignorance, without any criminal motive," the court further stating that "joint evil intent is necessary to constitute the offense, and you are therefore instructed that it is your duty to consider and to determine the good faith of the defendants and each of them."

[9] ID.—INTENT—EVIDENCE—COMMON OCCURRENCES—INSTRUCTIONS.—In such prosecution, the court having instructed the jury to the effect that in considering the question of intent the jury should "take into consideration all of the facts and circumstances disclosed by the evidence, it was not error to refuse defendants' proposed instruction emphasizing the testimony of the attorney who had advised defendants as to the legality of their scheme, and other like instructions wherein different circumstances from which the question of intent was to be determined were narrated and dealt with; and defendants' proposed instruction relating to "common occurrences" of organizing corporations outside of the state to evade the California statute, was likewise properly rejected.

[10] ID. — VOIR DIRE EXAMINATION OF JUROR — CONFLICTING ANSWERS —PROVINCE OF COURT.—In such prosecution, one of the jurors on *voir dire* examination having stated that while he entertained an opinion regarding violations of the Corporate Securities Act, the same as he did of violations of other penal statutes, he had no opinion regarding the facts of the pending case, and later on he having positively declared that if accepted as a juror he could and would "absolutely set aside that opinion,"

10. See 15 Cal. Jur. 431; 16 R. C. L. 282.

which had been founded on press reports and rumor, and try the case fairly and impartially, it was for the court to determine, if possible, which of the answers most truly revealed his true state of mind, and its action in disallowing defendants' challenge for cause was not error.

[11] ID.—VENUE — EVIDENCE. — In such prosecution, the respective purchasers of stock in the finance company having testified that the sales took place at their residences or places of business, as the case happened to be, which were designated in the record by street and number, and the data set forth on the cards seized in the office of the finance company relating to these sales specified the San Francisco residences or business addresses of the purchasers, this proof was legally sufficient in support of the venue in the city and county of San Francisco.

[12] ID.—STOCK IN FOREIGN CORPORATION—OWNERSHIP—BRINGING INTO STATE—PARTIES—PLEADING.—In such prosecution, the indictment having set forth that the securities in question were issued by a purported foreign corporation and were brought into this state by two of the defendants, the names of which two being stated, and sold by all of the defendants without a permit, it was not necessary to set forth the capacity in which said two defendants acted for the corporation in bringing said securities into the state, or whether they acted for it at all; and there was nothing anomalous or inconsistent in the situation that said corporation retained title to said securities, notwithstanding it had "issued" the same and they were in the constructive possession, at least, of said two defendants when brought into the state for disposal.

[13] ID. — CONSPIRACY TO VIOLATE CORPORATE SECURITIES ACT. — Conspiracy to violate the California Corporate Securities Act is a crime in this state.

[14] ID.—POLICE POWER — REASONABLE PROVISIONS — CONSTITUTIONAL LAW.—The California Corporate Securities Act is not open to the constitutional objection that the provisions of said act do not constitute a valid exercise of the police power of the state or that the same are unreasonable, arbitrary, oppressive, discriminatory, and in restraint of trade.

[15] ID. — PERPETRATION OF ACTS — PROSECUTION FOR CONSPIRACY. — The crime of conspiracy to violate the California Corporate Securities Act is a distinct offense from the actual commission of the crime forming the object of the conspiracy, and the fact, that the parties to the conspiracy succeeded in perpetrating the acts which of themselves constituted the crime they conspired

14. Blue sky laws, see notes in 15 A. L. R. 262; 24 A. L. R. 523; 27 A. L. R. 1169. See, also, 6 Cal. Jur. 780.

to commit, in nowise relieves them from liability under section 182 of the Penal Code.

[16] ID.—AMENDMENT OF LAW—REPEAL—EFFECTIVE DATE—HIATUS.— In such prosecution, there was no merit in defendants' contention that there was a hiatus in the operation of paragraph 3 of section 2 of the Corporate Securities Act at the time of its repeal in 1923, during which time the indictment against defendants was found, as the repealed law remained in force until the amendment took effect.

[17] ID.—VOLUNTARY APPEARANCE BEFORE CORPORATION COMMISSIONER —WAIVER OF IMMUNITY.—Where two of the defendants in such prosecution, in response to a subpoena directed to the foreign corporation, voluntarily appeared before the commissioner of corporations and did not claim the privilege of not giving testimony or of not furnishing evidence against themselves, they waived the immunity from prosecution provided for by section 17 of the Corporate Securities Act.

---

(1) 37 **C. J.**, p. 279, n. 70 New.    (2) 37 **C. J.**, p. 279, n. 70 New. (3) 12 **C. J.**, p. 638, n. 80; 37 **C. J.**, p. 279, n. 73.    (4) 12 **C. J.**, p. 633, n. 45, p. 634, n. 53; 16 **C. J.**, p. 667, n. 20; 37 **C. J.**, p. 279, n. 72.    (5) 16 **C. J.**, p. 567, n. 1.    (6) 37 **C. J.**, p. 275, n. 13, p. 279, n. 72; 40 **Cyc.**, p. 2367, n. 24.    (7) 12 **C. J.**, p. 642, n. 28 New; 16 **C. J.**, p. 1063, n. 85; 37 **C. J.**, p. 279, n. 74.    (8) 16 **C. J.**, p. 1050, n. 84; 37 **C. J.**, p. 278, n. 69 New.    (9) 12 **C. J.**, p. 641, n. 15 New; 16 **C. J.**, p. 1066, n. 89, p. 1067, n. 90, 92; 37 **C. J.**, p. 279, n. 74. (10) 35 **C. J.**, p. 353, n. 12.    (11) 37 **C. J.**, p. 279, n. 73.    (12) 37 **C. J.**, p. 279, n. 71.    (13) 12 **C. J.**, p. 553, n. 98, p. 780, n. 98, p. 782, n. 99, p. 847, n. 2, p. 902, n. 34.  ·(14) 12 **C. J.**, p. 1155, n. 68; 37 **C. J.**, p. 271, n. 53, 55.    (15) 12 **C. J.**, p. 581, n. 45.    (16) 37 **C. J.**, p. 214, n. 69 New.    (17) 16 **C. J.**, p. 96, n. 21.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Louis H. Ward, Judge. Affirmed.

The facts are stated in the opinion of the court.

Joseph A. Brown and R. P. Henshall for Appellant Eiseman.

Nathan C. Coghlan for Appellant Abrams.

Joseph McInerney and Stanislaus A. Riley, for Appellants Ives and Whelan.

U. S. Webb, Attorney-General, Wm. F. Cleary, Deputy Attorney-General, Matthew Brady, District Attorney, and Robert F. Fitzgerald, Deputy District Attorney, for Respondent.

KNIGHT, J.—The defendants, J. J. Eiseman, Alexander R. Abrams, Holmes Ives, N. J. Whelan, and John I. Pankratz, were jointly indicted by the grand jury of the city and county of San Francisco for the crimes of conspiracy to violate and of having violated the California Corporate Securities Act (Stats. 1917, p. 673), which declares in part that "no company shall sell . . . , or offer for sale, negotiate for the sale of, or take subscriptions for any securities of its own until it shall have first applied for and secured from the commissioner a permit authorizing it so to do . . . " (sec. 3) ; and that "every officer, agent, or employee of any company, and every other person who knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells or assists in causing to be issued, executed, or sold, any security . . . contrary to the provisions of this act . . . is guilty of a public offense. . . . " (sec. 12.)

The indictment contained eight counts, the first charging a conspiracy to violate said act, and the seven subsequent counts charging unlawful sales of corporate securities. The defendants were tried jointly and during trial the charges against Pankratz were dismissed; as to the other defendants the jury disagreed. Upon second trial Eiseman was convicted on all eight counts; Abrams was found guilty on seven counts charging actual violations of said act, but the jury disagreed as to the conspiracy charge; Ives was convicted on the conspiracy charge, the jury having failed to agree upon the remaining ones, and Whelan was convicted on the conspiracy charge and acquitted as to the others. All of the convicted defendants have appealed, and, with the exception of Ives and Whelan who join in their defense, are represented by different counsel and have filed separate briefs. The legal contentions advanced by the respective appellants are substantially the same, howeyer, and therefore the separate appeals may be considered together.

Aside from the claim that the evidence as a whole is insufficient to constitute the offenses charged, no question of disputed facts has arisen, but a statement of the evidence seems necessary to a correct understanding of the conspiracy charge and of the numerous legal problems presented. The record on appeal is voluminous, containing some 4,500 typewritten pages of reporter's transcript and more than 500 pages of printed and typewritten briefs; and although we shall attempt to relate only the essential facts, the summarization of them will necessarily be somewhat extended.

The transactions which eventually resulted in the indictment and conviction of appellants had their inception in a legitimate effort to aid in the financial affairs of an automobile tire company operating under California law, but developed into the consummation of a fraudulent scheme conceived by appellant Eiseman, in the promotion and profits of which his coappellants shared, whereby the worthless securities of a corporation organized by appellants in another state purposely to circumvent the effect of the California Corporate Securities Act, were, in violation of said act, brought into this state and sold to the stockholders of said tire company in particular, and to anyone else in general who might be induced to buy them.

During the year 1922 said tire company was and for some time prior thereto had been engaged in the manufacture and sale of automobile tires, Ives being its president, and Whelan its vice-president and chairman of the board of directors. It had issued and sold a large amount of its stock throughout California, but early in the year 1922, in order to increase its working capital, undertook a further stock selling campaign in which it enlisted the services of Eiseman, who at the time was a duly licensed stock broker. The campaign was not successful, and during the summer of 1922 Eiseman's connection with the enterprise ended. He then went to Los Angeles where he followed the brokerage business in connection with establishments unrelated to the tire company until his certificate as a broker was revoked for cause by the state corporation commissioner. Having learned while selling stock for the tire company that its stockholders were generally dissatisfied with their investments, Eiseman returned to San Francisco and unfolded to

one Max I. Smith, then a licensed broker and since deceased, a plan to develop a Utah coal mining corporation and to trade its stock to the stockholders of the tire company, of whom he had a complete list, for their stock in the latter company and certain cash considerations. Smith did not look upon the plan with favor, however, and declined to enter into it. Eiseman then suggested that a so-called finance company be formed for the ostensible purpose of financing the tire company by discounting the latter's trade acceptances and loaning it money upon the security of customers' accounts, Eiseman predicting that the stock and other securities issued by such a company could be readily disposed of to the dissatisfied stockholders of the tire company for their stock in the latter company at par and a like amount in cash or its equivalent. Smith encouraged the scheme and in furtherance thereof Eiseman, accompanied by Smith and one Carroll, a licensed salesman of corporate securities, visited the tire company's plant, where he conferred privately with Ives in regard to it. At the conclusion of the conference Eiseman informed Smith and Carroll that the proposition had been favorably received and if consummated he, Eiseman, would eventually be the owner of the tire company's factory. Thereupon, in the early part of September, 1922, Eiseman consulted with Roy Bronson, his attorney, as to the feasibility of the formation of the proposed finance company under the laws of the state of Delaware, so as to evade the effect of the California Corporate Securities Act and allow such company to operate and to sell its stock and securities in this state without the necessity of obtaining a permit for that purpose from the corporation commissioner. Bronson prepared an outline of such a company, together with a plan for the sale of its stock and securities in that state to Eiseman, and advised that such proceedings would be legal and if carried out would allow said stock and securities to be disposed of in this state by licensed brokers without · interference or permit from the California corporation commissioner. Bronson's plans were later approved at a conference attended by Eiseman, Ives, and Whelan, and on December 19, 1922, at the request of those mentioned, he caused said projected company to be incorporated in Delaware, under the name of ''Bankers

Mortgage and Discount Company," with three "dummy" directors and an authorized capital of $2,500,000 of class "A" common stock of the par value of $100 per share, and 5,000 shares of class "B" common stock of no par value. Immediately after organizing, the directors in Delaware authorized the issuance to Ives and Whelan of the entire class "B" stock in purported consideration of services rendered by them in organizing the new company, and also authorized the issuance of $1,000,000 of six per cent "income gold debentures" of the denomination of $100 each. Thereupon, in accordance with the Bronson plan, and on December 20, 1922, the directors entered into a contract purporting to sell to Eiseman $1,000,000 of its class "A" stock and $500,000 of its debentures in units of two shares of stock and one debenture of the aggregate face value of $300 a unit for the sum of $120 a unit, making a total purchase price of $600,000, of which $25,000 was to be paid upon the execution of said contract and the balance in installments ranging in amounts from $25,000 to $300,000, the last installment falling due on June 1, 1925. Negative evidence was introduced by the prosecution sufficient to establish the fact that neither the initial payment of $25,000 above mentioned nor any of the others were ever made.

As part of the same transaction the directors executed a trust and escrow agreement pursuant to which the stock and debentures mentioned in the Eiseman agreement were afterward deposited with a San Francisco firm to be delivered to Eiseman upon payment or evidence of payment of sums equivalent to the agreed purchase price. Immediately thereupon the principal place of business and in fact everything belonging to the Delaware corporation was moved to California, where the "dummy" directors were succeeded by a new board consisting in part of Eiseman, Ives, and Whelan; Ives becoming president and Eiseman vice-president and managing director. In February, 1923, upon presenting the incorporation documents to the California Secretary of State for filing it was learned that the "Bankers Mortgage and Discount Company" could not be domesticated in this state because the local Bank Act (Stats. 1909, p. 87) prohibited the use of the word "Bankers" by a corporation engaged in a business not falling within the scope of such

act. Another corporation was then organized under the laws of Delaware known as "California Mortgage and Discount Company" with a capitalization of 100 shares of the total value of $10,000, the entire stock of which was purported to have been purchased by "Bankers Mortgage and Discount Company" in consideration of the transfer to it of 1,000 shares of the tire company stock; but neither transfer was ever made. California Mortgage and Discount Company was then moved to and domesticated in California, the personnel of its officers and board of directors being substantially the same as those of its companion Delaware company, and was thereafter represented as being an operating subsidiary of the last-named corporation, with like objects and purposes, and occupied the same offices in San Francisco.

Early in January, 1923, Eiseman revealed to Carroll the method by which and the time when he expected to realize large sums of money from the operation of his enterprises. He stated that in April, 1923, the finance company would declare a "dividend" which he intended should be paid out of the money received from previous stock sales (which dividend was in fact declared and paid in part as planned) and that as a result of the "reload," meaning as he said that those who had already bought securities would make further and greater purchases, the "blow-off" would come and that with the large sums of money received he would be able to retire and live in Italy.

During the middle of December, 1922, which was prior to the date of the conversation just mentioned and before the date of the incorporation of the finance company in Delaware, and notwithstanding that said company was at that time wholly unauthorized to transact any business, plans were laid to sell its securities in this state and many sales were actually made in Santa Clara, Napa, and Sonoma Counties. A public meeting was held in San Jose which was attended largely by the tire company stockholders residing in the Santa Clara Valley in response to notices prepared and sent by Eiseman under the name of the tire company and Ives as president. An address, illustrated by moving pictures taken for that purpose, was delivered by Whelan regarding the operation of the tire company's plant and the manufacture of its products, after which Eiseman elaborated

upon the objects and purposes of Bankers Mortgage and Discount Company. Smith and Carroll remained over a few days after the meeting to close initiated sales, while at the same time Eiseman and Whelan canvassed the owners of tire company stock and others in the Napa and Sonoma Valleys. In January, 1923, Eiseman, accompanied by Carroll, visited and made sales among the tire company stockholders in the vicinity of Santa Cruz, their arrival being preceded by introductory telegrams purporting to come from Ives, but which were in fact sent by Eiseman. In making these sales and at the Santa Jose meetings false statements were made which clearly proved a deliberate design to impose grossly on those who might be induced to invest in said finance company. It was represented generally that the business of said company would be to supply the tire company with working capital, upon the security of customers' accounts and through the discount of trade acceptances, that thereby the .tire company would be placed in a prosperous condition; and Eiseman emphasized the dual advantage which he said would accrue to those tire company stockholders who would surrender their stock in part payment of the new company's securities.

Among those purchasing in San Jose was one John Scherr, who, on account of illness, had been incapacitated from work for six years, making it necessary for his wife to earn the livelihood for both. Scherr and his wife were told that the finance company's securities would pay dividends of six per cent every three months and that the profits the Scherrs would receive therefrom would soon be enough to make it unnecessary for Mrs. Scherr to work. The Scherrs turned in their one hundred shares of stock in the tire company and in addition Mrs. Scherr was persuaded to call in an outstanding seven per cent loan of $1,500 and invest that money in these securities. Later when a check for $90 was delivered to the Scherrs in payment of a ''dividend'' the agents told them that further ''dividends'' would be paid at intervals of about every three months, and that they would soon be able to purchase a fine automobile like the one the agents were then taking them to ride in. They were then asked if they had any other securities to invest, such as Liberty bonds, to which Mrs. Scherr replied that all they had left

besides their home was a life insurance policy for $1,000. She was induced to part with this policy, but after retaining it for several weeks it was returned with the explanation that it was not convertible. In Sonoma County Eiseman and Whelan on December 18, 1922, called upon a man named Trubody, and under the same misrepresentations as to the purposes of the finance company obtained from him 400 shares of the tire company stock at a valuation of $5,000 and 50 shares of Great Western Power stock with a like valuation of $5,000 as payment for 200 shares of the finance company stock. To another stockholder named Mastrup the additional representation was made that Eiseman was a banker and had formed a new company to do a banking and financing business in aid of the tire company, and from him they obtained five shares of the tire company stock and five shares of Dusenberg automobile stock, the latter stock being taken in as the equivalent of cash; but unintentionally he omitted to indorse the stock. It was returned to him with the request that he do so promptly that he might participate in the coming dividend. He complied with the request, later received the "dividend" and purchased more securities. One Arthur Forni of Napa County, although not a stockholder in the tire company was induced to give his promissory notes aggregating $25,000 in payment of 250 shares of class "B" stock and debentures of the face value of $25,000 upon the assurance of Eiseman, supported by a fictitious telegram, that Forni would be made a director and the vice-president of the finance company. He became neither.

A purchaser named Hitchings, residing in Santa Cruz, testified that Eiseman represented to him that the finance company was in process of formation, that it already had money in the treasury and would pay a dividend on April 1st; that the money received from the sales of class "B" stock was to be held until the "end of the financing period" and then returned; that subscribers for that stock were to be made associate directors of the company so as to keep in touch with the company's affairs and if dissatisfied could withdraw and receive back the money and stock they had paid in. The real financing of the company, it was represented, was to come from the sale of class "A" stock and

the debentures. Hitchings was induced to subscribe for 241 shares of class "B" stock, giving in payment thereof an assigned note and mortgage for $8,000 and 405 shares of tire company stock.

Shortly after the trip to Santa Cruz a disagreement arose between Eiseman and Carroll, as a result of which Carroll severed his connection with the Eiseman schemes; but before doing so he threatened to advise Hitchings and others of the fraudulent character of Eiseman's enterprises. Thereupon Eiseman wired Hitchings that Carroll had been discharged "for very good cause" and warning Hitchings of Carroll's threat to "spread venomous propaganda," and a few days afterward called upon Hitchings personally regarding the same matter. About this time Smith became seriously ill and withdrew from further association with Eiseman. His place as the broker for the finance company was filled by appellant Abrams, who had theretofore been sharing the Eiseman offices, although until Smith's death apparently was not interested in the promotion of said finance company. He had been doing business pursuant to a broker's license under his own name, Alexander R. Abrams, as well as under the fictitious names of Alexander and Company and Bankers Security Company. Under this latter designation and for an over-riding commission of two and one-half per cent on all sales he consented to act as the broker for the sale of the securities of the Bankers Mortgage and Discount Company.

Thereafter, about the middle of February, 1923, the active campaign for the sale of the finance company's securities commenced. Salesmen were sent out with letters of introduction signed by Eiseman and Ives. Preparatory circular letters and prospectus were mailed to all stockholders of the tire company containing Ives' indorsement of the new company and recommendations to purchase its securities. Sales were plentiful, the purchasers buying mostly units of class "A" stock and debentures for which they paid one-third cash or its equivalent in convertible securities, one-third in tire company stock at par and the balance in unsecured promissory notes. It was following Abrams' connection with the affairs of the finance company that the

sales were made to the individuals named in the seven counts charging actual violation of the statute.

Under date of February 18, 1923, Hitchings wrote to Ives about a phone message from Carroll in which Carroll had said that upon investigation he had ascertained that "the story that Mr. Eiseman was connected with the notorious Alexander and Company" was true; also that the finance company was not a California corporation, had not complied with laws of this state and consequently was without authority to sell any stock in California; that for those reasons he, Carroll, had withdrawn from the company and advising him, Hitchings, to protect himself. Hitchings added that "this story about Mr. Eiseman . . . had been circulating around town for some time" and was "bad for both companies," and that he would like to have Ives send him "a plain statement of facts as he knew them regarding Eiseman's connection with Alexander and Company," also as to "Eiseman's reputation and standing in the financial and business world." The reply to this letter was signed and mailed by Ives, but was in fact written by Eiseman on one of the tire company's letter-heads, Ives having delivered Hitchings' letter to Eiseman for that purpose. The reply was in part as follows: "My Dear Mr. Hitchings: Your personal letter to me bespeaks the acme of my desire. I have always been glad to hear from the stockholders directly. Relative to your inquiry regarding Mr. Eiseman's reputation and standing in the business world, it gives me great pleasure to inform you that I have personally known Mr. Eiseman for more than two years, during which time he has been in the active management of the finances of our company. The results that he brought us speak in the highest and most laudatory. terms for themselves. We have always found him honorable, truthful and unequivocally honest. His financial standing, personal and property liabilities would be jealously coveted by men much older than he. Before coming to our company I personally made an exhaustive research into his antecedents and the recommendations I received were of the highest. You, nor anyone else need have any apprehension over any dealings entered into with Mr. Eiseman. At any time that you should find it possible to visit with me at my offices, I shall be glad to go into

detail in eulogizing Mr. Eiseman's past and present status. Regarding Alexander & Company, permit me to state, with emphasis, that Mr. Eiseman was at no time connected with that firm. On the other hand, when he discovered that they were handling our stock he immediately put forth every effort and succeeded in squelching their activities." It was further stated that Eiseman was justified in dispensing with the services of Carroll on account of the latter's "chicanery in the San Jose deal." Any suspicions entertained by Hitchings were thus dispelled and he became an ardent supporter of the new company. In March, 1923, Eiseman stated to another subscriber, who had been referred to Eiseman by Whelan, that the tire company had about one million dollars' worth of business, of which about sixty per cent had been available to the finance company since its organization, out of which the finance company had already made a net profit of about $80,000.

On March 23, 1923, the finance company passed a resolution declaring a "dividend" payable April 1, 1923. On April 2, 1923, under authority granted by the Corporate Securities Act, the corporation commissioner issued a subpoena directed to Bankers Mortgage and Discount Company, Alexander and Company, Bankers Securities Company and Coast Syndicate Company to appear on April 12, 1923, and report as to the securities issued and sold by Bankers Mortgage and Discount Company. Up to that time said companies had done no business whatever except to sell stock and debentures, but after the service of said subpoena there was a manifestation of business activity. On April 10, 1923, an account was opened in the Bank of California in the name of the California Mortgage and Discount Company and certain securities which had been theretofore received from purchasers of stock were placed in the bank for sale and to the credit of that account. On that same date two checks for $2,500 each were drawn against the account payable to the account of the tire company and on April 30th another check was drawn for $5,000 payable to the same company. The purpose of these payments was not disclosed by the evidence, but if made as loans no trade acceptances, notes, or other securities were ever received by said company as security nor did the tire company ever

acknowledge receipt of the amounts of said checks. The evidence shows that after the service of said subpoena changes were made in the Abrams records, carried under the name of Bankers Securities Company so as to make the entries agree with the theory of a sale by said finance company of its stock and securities to Eiseman and a resale by Eiseman to Abrams. Orders were also issued to the escrow depositary in San Francisco to deliver shares of stock and debentures to purchasers whose subscriptions had been paid up, although evidence of the payment of cash or its equivalent for these purchases never reached said escrow depositary.

Responding to said subpoena a verified return accompanied by a so-called "consolidated balance sheet" prepared by the finance company and its subsidiary company was filed by Abrams containing erroneous statements of operations and misrepresentations of the assets of said subsidiary company. There was also prepared and filed with said commissioner an application for a permit to issue and sell the securities of the finance company.

On May 25, 1923, the records of Eiseman and Abrams and of the finance company and its subsidiary, in San Francisco, were seized and their offices closed by the district attorney acting under the authority of search-warrants. It appears from the records thus seized that during the operation of these enterprises there had been sold to purchasers 1,439 units of the finance company's securities aggregating a sale price of $431,700, of which amount $139,163.41 was accepted in unsecured purchase notes, $119,315 in tire stock at par and the balance was in cash and securities other than the notes and tire stock already mentioned. The total amount of all cash received as initial cash payments and from the sale of convertible securities was $148,035.83. In addition the receipts from sales of class "B" stock made up of cash, purchase notes, tire stock, and other securities amounted to $120,427, of which amount there was in cash and convertible securities $48,402.

In the meantime, and after the service of said subpoena, the subsidiary company issued a check for $2,000 payable to Ives, with no explanation being made therefor; Eiseman sold to said company an unsecured note given by one Peasley, a purchaser of class "B" stock; large sums of cash re-

ceived from purchasers were transferred from the account
of Bankers Security Company to the personal account of
Eiseman in another bank; other remittances were made to
Ives by Eiseman with explanatory letters to the effect that
the same constituted Ives' share of cash received from the
purchases of class "A" stock and debentures; Eiseman,
through Abrams, caused the assignment or transfer of
various mortgages and other securities received as portions
of the purchase price of class "A" stock and debentures
to be made to Eiseman's mother-in-law under the names of
Mrs. James Burns and Mrs. Elizabeth Burns, and to his
wife under her maiden name, Joyce Ivy Burns. So that as
a result of these numerous payments and transfers there
was left on hand at the, time of the seizure under the search-
warrants the sum of $97.28 in cash, various delinquent and
overdue mortgage notes, and shares of stock of no market-
able value, and a number of untransferred certificates rep-
resenting shares of stock of the tire company which had been
received from purchasers. The evidence further shows that
no trade acceptances were ever received by either of the
Delaware companies from the tire company; no loans were
ever made to the tire company other than the sum of $10,000
represented by the checks already mentioned which were issued
after the service of said subpoena, and no promissory notes
or other evidence of the indebtedness were ever assigned or
transferred to said Delaware companies by the tire com-
pany, and, furthermore, no record could be found of any
transfer by either Eiseman or Abrams to either of the Dela-
ware companies of any purchasers' notes or shares of tire
stock turned in by them in payment of Delaware securities.

[1] One of the appellants' principal contentions is that
the plan adopted and executed by them in the organization
of Bankers Mortgage and Discount Company and the sub-
sequent sale of its stock and securities in this state, as such
plan was established by the uncontroverted evidence adduced
by the prosecution, did not constitute a violation of the Cor-
porate Securities Act, and that therefore they are not guilty
of the crimes of which they were convicted. This contention
is based mainly upon the theory of a valid sale to Eiseman
in the state of Delaware of the securities mentioned in the
Eiseman agreement, to which the charges in the indictment

exclusively relate. Appellants claim that as a result of corporate action taken in that state, Eiseman acquired title therein to said securities, and that consequently a resale of the same in this state in repeated and successive transactions by brokers duly licensed by the corporation commissioner was permissible under subdivision A of section 9 of said act. In behalf of Ives and Whelan it is asserted, in effect, regarding the class "B" stock, the title to which stands substantially upon the same ground as the securities covered by the Eiseman agreement, that the motive underlying the transfer of securities in a foreign state may not be inquired into in this state; that even though the acts resulting in the transfers be "tinctured with a malign purpose, yet, having been done outside the state of California, and beyond its jurisdiction, the legal effects would be the same." In furtherance of their theory of a valid sale to Eiseman in Delaware, appellants, at the trial, proposed a number of instructions which they claim embodied the law as it is declared in many cases in this state, among them being *Hughes Mfg. & Lumber Co.* v. *Elliott,* 178 Cal. 181 [172 Pac. 584]; *Laurence* v. *Pacific Oil & Lead Works,* 27 Cal. App. 69 [148 Pac. 964]; *Provident Gold Min. Co.* v. *Manhattan Securities Co.,* 168 Cal. 304 [142 Pac. 884]; *Lund* v. *Granahl,* 22 Cal. App. 103 [133 Pac. 501]. The court refused to give these proposed instructions and in lieu thereof instructed the jury in substance as follows: that no title passed to Eiseman solely by reason of the execution of said agreement; that the recitals contained therein as to payment of the purchase price for said securities were not binding upon the People of the state of California; that the legal effect of said agreement was that title should not pass until there was paid an amount equivalent to the agreed purchase price; that consequently if the jury found that no payments were made then title did not pass to Eiseman, but if it was found that some payments were made, title to such portion of said securities as were paid for and no more passed to and vested in him. Appellants claim that the law as thus given to the jury is contrary to the rule adhered to in the cases above mentioned as well as in the cases of *Hart Wood Lumber Co.* v. *Bonaly,* 192 Cal. 180 [219 Pac. 432], *Gopcevic* v. *California Packing Corp.,* 64 Cal. App. 132 [220 Pac.

1078], and *Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212 [9 Am. St. Rep. 199, 18 Pac. 248]; that therefore the giving of those instructions constituted reversible error.

Even though it is assumed that appellants' interpretation of the law of sales of personal property, with special reference to the question of passing title prior to the payment of the purchase price be correct, we are of the opinion that the rule contended for by them may not be revoked in a situation like the one here presented, where the evidence shows the object of the contract was not to provide for a legitimate sale and transfer of title to property, but to all intents and purposes was to create a mere fiction of law, constructed upon a collusive and fraudulent intent and design to violate and defeat the provisions of a penal statute. Under such circumstances we do not believe that such a transaction can be resolved into a legal contractual relationship so as to be controlled by legal rules of ownership applying to legitimate contracts of sale. In all of the cases cited by appellants the contracts considered were founded upon *bona fide* sales, free from the element of a fraudulent intent to defeat the operation of an existing law, and the controversies were confined to the parties related to the contracts. Here the evidence shows that the purported sale of these securities was in effect one from Eiseman to himself based upon no consideration whatever, and manifestly the product of a criminal design. [2] When such a contract is presented for recognition in this state, as being legally sufficient to place the parties claiming under it beyond the scope of the law of this state, the state itself becomes an interested party to the contract to the extent at least of having the right to inquire into the *bona fides* of the transactions upon which the contract is founded. Fraud vitiates all transactions into which it enters (12 Cal. Jur. 721) and in view of the evidence disclosed by the record upon this subject it would scarcely be contended, we think, that in an appropriate proceeding instituted by an interested party the purported contract of sale in question would not be declared void. We believe therefore that by reason of the circumstances surrounding the purpose of this contract appellants may not shield themselves behind a salutary legal principle which ordinarily would be applicable to the case

of a genuine sale. In the case of *People* v. *McCalla,* 63 Cal. App. 783 [220 Pac. 436], the defendant was found guilty of a violation of the Corporate Securities Act in that he sold without permit securities issued under a subterfuge, and it was said: ''The case falls within the letter and the spirit of the act, and it would be a reproach to the administration of the law if the perpetrators of such a thinly veiled attempt to circumvent the manifest purpose of this salutary legislation should go unwhipped by justice.'' The language quoted does not seem inappropriate here. True, the jury was instructed that fraud was not an issue in the case, but this instruction, as appears from the context, was manifestly given for the sole purpose of preventing the jury from becoming confused with the idea that the prosecution was being had under subdivision 4 of section 182 of the Penal Code instead of subdivision 1 of said section; and had no reference to that part of the indictment charging that appellants did ''falsely, *fraudulently,* and corruptly and feloniously . . . conspire'' to violate the Corporate Securities Act (italics ours). If it be a fact, as appellants contend, that 208 units of said securities were actually delivered to Eiseman in Delaware the status of the transaction is not altered, if for no other reason than that several hundred thousand units were brought into the state and 1,439 of them were actually sold here. In this connection it is to be noted that at no time during the sale of these securities was it intimated that privately owned stock was being disposed of.

The trial court carefully and correctly informed the jury that ''evasion of the law in and of itself is not a crime,'' but further stated that if it was proved beyond a reasonable doubt that the acts and conduct charged in the indictment were true, and ''were instituted with intent of evading the law of California, *and by such evasion to violate the Corporate Securities Act of California*'' (italics ours), then such acts and conduct were in violation of the penal statute under which appellants were being prosecuted; also that all of the acts proved should be considered by the jury in determining whether or not they constituted an entire or part of a scheme, system, plan, or design by which the Corporate Securities Act ''was to be evaded and *violated*'' (italics ours), and that if the jury entertained any reason-

able doubt as to the existence of any of the essential facts or features of the crime of conspiracy as they had been enumerated by the court, a verdict of guilty should not be found against any defendant as to whom such doubt existed. The instructions given upon the question of passing of title, which appellants assail, may be readily reconciled with the theory that if the jury found as a fact that the payments were made by Eiseman as recited or called for in the agreement, such fact might be taken as proof of the good faith of the transactions, in which event, as already pointed out, the chief element of the offense with which appellants were charged, namely, a fraudulent design to violate the statute, would doubtless be effectively destroyed.

The recent case of *People* v. *Pace*, 73 Cal. App. 548 [238 Pac. 1089], cited by appellants, does not aid them. There the defendant, president of a California corporation actually engaged in the candy business, made a *bona fide* purchase from the corporation for a cash consideration of certain unpaid promissory notes given to the company in payment of the purchase of stock, the stock for which the notes were given being held by the company as collateral for the payment of said notes. In accordance with the terms of the notes and upon default in the payment thereof the defendant dealt with the stock as though it were his own, disposing of at least a portion of it in different sales extending over a period of five months, without having a permit for that purpose. Briefly stated, the court held that to the extent that section 9 of the Corporate Securities Act attempted to require a natural person to secure a broker's permit before he may sell his own securities, when he is not the issuer or underwriter of the same, it was unconstitutional. It is at once apparent that that case, being free from the element of fraud, is clearly distinguishable from the instant one upon the facts.

[3] After giving full consideration to all contentions made by appellants regarding this branch of the case we conclude that the evidence is sufficient to establish the offenses of which appellants were convicted.

Appellants also rely for reversal upon a number of alleged errors of law which they claim occurred during trial. Being too numerous to deal with singly, it may be stated

that they relate generally to rulings upon the admissibility of proof and to the giving and refusal to give certain instructions. [4] The evidence objected to consisted mostly of statements made by the different appellants out of the presence of each other, representations made by appellants' agents to the purchasers in selling said securities, written communications and other documents sent out by the different appellants and by members of their respective office staffs in the negotiation and consummation of sales, and particularly evidence of the transactions had between Abrams' Bankers Security Company through which the sales passed and the purchasers. After examining the record regarding these points we are satisfied that the evidence alluded to reasonably tended to connect the different appellants with the conspiracy, or else amounted to statements, acts, declarations, or correspondence of appellants, or of their agents and employees, during the progress of the conspiracy and in aid of the common design and purpose thereof, and that the same were admitted in evidence after a foundation had first been laid by proof tending to establish the fact of such conspiracy. Such acts, statements, declarations, and correspondence were therefore properly admitted as evidence against each member of the confederacy. (*People* v. *Schmidt*, 33 Cal. App. 427 [165 Pac. 555]; *People* v. *Creeks*, 170 Cal. 368 [149 Pac. 821]; *People* v. *Kauffman*, 152 Cal. 331 [92 Pac. 861]; *People* v. *Vacarella*, 61 Cal. App. 119 [214 Pac. 237]; *People* v. *Mazzurco*, 49 Cal. App. 275 [193 Pac. 164]; *People* v. *MacPhee*, 26 Cal. App. 218 [146 Pac. 522]; 16 Cor. Jur. 654.) We furthermore believe that all of the letters, circulars, checks, and other documents objected to were sufficiently identified and connected with appellants or with the conspiracy to justify their admission in evidence. The anonymous letter containing a warning to one of the purchasers to withdraw from the enterprise was expressly referred to in one of Eiseman's letters and therefore was admissible in evidence; and in any event its contents were not harmful. The evidence of the transfer of proceeds from the sale of securities to the accounts of Eiseman and to Ives, and the letters and documents incidental to these transfers had a direct bearing upon the furtherance of the conspiracy as it was originally planned by Eiseman. [5]

Appellants strenuously urge and have extensively argued the point that the books, papers, and files seized under the search-warrants were inadmissible in evidence because as they claim the proceedings and documents upon which the seizure was grounded were void. But assuming that the search-warrants were defective, the contention that the evidence seized thereunder was inadmissible is completely answered by an adverse ruling in the case of *People* v. *Mayen,* 188 Cal. 237 [24 A. L. R. 1383, 205 Pac. 435]. [6] The fact that Eiseman was a licensed attorney at law of this state and that upon the door of his offices appeared the wording "Law Offices of J. J. Eiseman," did not disqualify Miss Colt from testifying as to the identity and authenticity of correspondence, documents, and papers issued by and belonging to the files of Bankers Mortgage and Discount Company (subd. 2, sec. 1881, Code Civ. Proc.), for the reason that her duties were that of clerk, bookkeeper, and cashier for the company mentioned, and none of the knowledge regarding which she testified was acquired by or imparted to her in the capacity of a clerk, secretary, or stenographer of an attorney at law; moreover, there is no claim made that the business enterprises forming the basis of these charges were promoted by Eiseman as an attorney at law.

The question of the character of the so-called certificate issued and given in payment for class "B" stock is not a material matter because the charges in the indictment related to the securities covered by the Eiseman agreement; but even if material, said certificates must be construed as "securities" of said company within the meaning of the Corporate Securities Act (*People* v. *McCalla, supra*). The other errors urged in reference to the admissibility of proof are either unimportant or insufficiently presented (*People* v. *McLean,* 135 Cal. 306 [67 Pac. 770], and hence do not require discussion.

[7] As to the instructions, we have examined the entire charge of the court and also the instructions proposed by appellants which the court refused to give. From such examination we believe that when the court's charge is considered as a whole the jury was fairly and fully instructed upon all legal subjects pertaining to the offenses for which appellants were on trial, and also upon such legal matters as were necessary for the guidance of the jury in the exer-

cise of its duties and prerogatives. Besides the matters already alluded to, the court's charge included instructions as to all material provisions of the Corporate Securities Act, the law of conspiracy, the question of intent, the right of parties in this state to incorporate and transfer securities outside of this state, and law bearing upon the territorial limitations of the California statutes; also the doctrine of reasonable doubt, burden of proof and the benefit of legal presumptions. Many of the appellants' proposed instructions which the court refused to give contained legal principles which were substantially embodied in the court's charge; others were offered in support of appellants' theory of a valid sale to Eiseman in Delaware; and the remaining ones related to matters which were immaterial to the issues, or contained some asserted principle of law which justified the refusal of the entire instruction. It was clearly within the province of the court to instruct as to the legal effect of the purported contract of sale, leaving to the jury for decision the disputed question of fact as to whether or not there was a *bona fide* sale.

Only a few of appellants' objections regarding instructions require special attention. [8] They complain that in dealing with the subject of conspiracy the court in one part of its charge, upon the element of intent, instructed the jury that the question for it to pass upon was whether appellants "conspired to do the things which were in violation of law, not whether they had any knowledge that they were violating the law." The legal principle thus stated was doubtless applicable to the charges of actual sales of securities. (*People* v. *McCalla, supra.*) If, however, as appellants contend, it be open to criticism when connected with the law of conspiracy, we do not believe the jury could have been misled by the instruction for the reason that the court as a part of the same instruction also stated to the jury explicitly that mere association of individuals with an innocent purpose or with honest intent is not a conspiracy as defined by law; also that in determining the guilt of appellants upon the conspiracy charge the jury should consider whether appellants "honestly entertained a belief that they were not committing a wrongful act" and whether or not they "were acting under a misconception or in ignorance, without any criminal motive"; the court further stat-

ing, "Joint evil intent is necessary to constitute the offense, and you are therefore instructed that it is your duty to consider and to determine the good faith of the defendants and each of them." Considering the instruction as a whole, we think the jury could not have misunderstood the court's meaning that a corrupt motive was an essential element of the crime of conspiracy. (Wharton's Criminal Law, 11th ed., sec. 1606.)   [9]  The court was justified in refusing to give appellants' proposed instructions emphasizing Bronson's testimony as to the legal advice furnished appellants, and other like ones wherein different circumstances from which the question of intent was to be determined were narrated and dealt with in separate instructions, for the reason that a general instruction was given to the effect that in considering the question of intent the jury should "take into consideration all of the facts and circumstances disclosed by the evidence." The proposed instruction relating to "common occurrences" of organizing corporations outside of the state to evade the California statute, was properly rejected as embodying an immaterial matter; likewise those instructions relating to the title to the class "B" stock. The remaining objections as to the instructions are of less importance and possess no merit.

[10] We find no error in the ruling disallowing a challenge for cause to Juror Scovel. The juror stated that while he entertained an opinion regarding violations of the Corporate Securities Act, the same as he did of violatons of other penal statutes, he had no opinion regarding the facts of this particular case. While later during his examination there may have been some slight confusion in his answers upon the point, he positively declared that if accepted as a juror he could and would "absolutely set aside that opinion," which had been founded on press reports and rumor, and try the case fairly and impartially. "When such conflict occurs (in the answers of the juror) the trial court must decide, if possible, which of the answers most truly reveals the state of the talesman's mind. In other words, the questions generally presented are those of fact and not of law. (*People* v. *Loper,* 159 Cal. 6 [Ann. Cas. 1912B, 1193, 112 Pac. 720].)

[11] Proof in support of venue as to counts three, four, five, six, and seven, while not as substantial as it might have

been, was legally sufficient to meet the requirements of the rule stated in *People* v. *McGregor,* 88 Cal. 140 [26 Pac. 97] ; the respective purchasers having testified that the sales took place at their residences or places of business, as the case happened to be, which were designated in the record by street and number; and, furthermore, the data set forth on the cards seized in the office of said finance company relating to these sales, specified the San Francisco residences or business addresses of the purchasers.

[12] The demurrer to the indictment was properly overruled. It was alleged in the indictment that the securities mentioned were issued by a purported foreign corporation and were brought into this state by Eiseman and Abrams as the property of said corporation and sold by all of the appellants without a permit. It was not necessary, as appellants contend, to set forth the capacity in which Eiseman and Abrams acted for the corporation in bringing said securities into the state, or whether they acted for it at all, nor does there seem to be anything anomalous or inconsistent in the situation that said corporation retained title to said securities, notwithstanding that it had "issued" the same and that they were in the constructive possession, at least, of Eiseman and Abrams when brought into the state for disposal. The indictment was not subject to the objections raised and favorably ruled upon in *People* v. *Barnard,* 63 Cal. App. 562 [219 Pac. 756], for the reason that the conspiracy here was confined to the violation of the Corporate Securities Act.

[13] Appellants claim that there is no such crime in California as conspiracy to violate the Corporate Securities Act. Since the instant case was briefed and submitted, however, this precise question has been considered and the matter decided contrary to appellants' views by the supreme court in the case of *Doble* v. *Superior Court,* 197 Cal. 556 [241 Pac. 852]. The decision therein completely answers all of appellants' contentions made in this behalf.

Appellants also attack the constitutionality of the entire Corporate Securities Act upon some eight grounds, but in presenting them counsel say that the objections urged overlap one another, making it impossible to consider them separately. For the same reason it would seem equally im-

possible to discuss or decide them separately. However, specifically answering some of the grounds urged, it may be stated that section 12, which declares that all securities sold in violation of said act shall be void, is nowise involved in this criminal action. The assertion that said act illegally delegates judicial functions (as distinguished from *quasi-judicial* functions) and also legislative powers to the corporation commissioner appears to be amply disposed of by the cases of *Doble Steam Motors Corp.* v. *Daugherty,* 195 Cal. 158 [232 Pac. 140], *Suckow* v. *Alderson,* 182 Cal. 247 [187 Pac. 965], and *Brechen* v. *Riley,* 187 Cal. 121 [200 Pac. 1042]. **[14]** Summarizing the remaining constitutional objections they are in effect that the provisions of said act do not constitute a valid exercise of the police power of the state and that the same are unreasonable, arbitrary, oppressive, discriminatory, and in restraint of trade. Again, we are relieved of the task of answering appellants' arguments by citing a number of cases in which similar questions have been exhaustively argued and finally decided. The cases referred to are *Halsey & Co.* v. *Merrick,* 228 Fed. 805; *Merrick* v. *N. W. Halsey & Co.,* 242 U. S. 568 [61 L. Ed. 498, 37 Sup. Ct. Rep. 227], *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539 [Ann. Cas. 1917C, 643, L. R. A. 1917F, 514, 61 L. Ed. 480, 37 Sup. Ct. Rep. 217], *Caldwell* v. *Sioux Falls Stockyards Co.,* 242 U. S. 559 [61 L. Ed. 493, 37 Sup. Ct. Rep. 224]·, *Agnew* v. *Daugherty,* 189 Cal. 446 [209 Pac. 34], and *In re Girard,* 186 Cal. 718 [200 Pac. 593]. In passing upon these constitutional objections generally the court said in *Merrick* v. *N. W. Halsey Co., supra:* "We think the statute under review is within the power of the state. It burdens honest business, it is true, but burdens it only that under its forms dishonest business may not be done. This manifestly cannot be accomplished by mere declarations; there must be conditions imposed and provision made for their performance. Expense may thereby be caused and inconvenience, but to arrest the power of the state by such considerations would make it impotent to discharge its functions." In conformity with the law as announced in the cases cited it must be held here that the act in question is not unconstitutional.

[15]  The crime of conspiracy is a distinct offense from the actual commission of the crime forming the object of the conspiracy, and the fact that the parties to the conspiracy succeeded in perpetrating the acts which of themselves constitute the crime they conspired to commit, in nowise relieves them from liability under section 182 of the Penal Code. (*People* v. *MacPhee, supra.*)  It follows that the guilty parties may be legally convicted of both crimes.

[16]  We cannot agree with appellants that there was a hiatus in the operation of paragraph 3 of section 2 of said act at the time of its repeal in 1923 (Stats. 1923, p. 87), during which time this indictment was found, for the reason that the existing law remained in force until the amendment took effect.

[17]  The claims of Eiseman and Abrams that they were entitled to immunity because they gave evidence before the corporation commissioner on April 12, 1923, are without merit.  Section 17 of the Corporate Securities Act provides in part that ''No person shall be excused from testifying or from producing any book, document, or other thing bearing upon the ground that his testimony, or the book, document, or other thing required of him, may tend to incriminate him, or may have a tendency to subject him to punishment for a felony . . . ; but no person shall be prosecuted . . . , or subjected to any penalty . . . for or on account of any act, transaction, matter, or thing concerning which he shall have been so *compelled* to testify under oath, or to produce such documentary or other evidence . . . ''  (Italics ours.)  It is apparent, we think, that the law contemplates that the witness claims the privilege of not giving testimony or of not furnishing evidence against himself before he is entitled to the immunity provided for by the statute.  It is conceded that such claim was not made by either Eiseman or Abrams; furthermore, the subpoena was not directed personally to either of them, but to the corporations.  Their responses to the subpoena must consequently be considered as having been voluntary.

After a full review of the evidence in this case and a careful examination of the legal points presented, it is our opinion that the appellants were fairly tried and justly convicted.  It is therefore ordered that the judgments of con-

viction and the orders denying their motions for new trials, which were also appealed from, be and each of them is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 1, 1926, and a petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 30, 1926.