[Sac. No. 1918.  Department Two.—January 16, 1914.]

## ALBERT W. SCHOLLE, Appellant, v. JOHN FINNELL, Jr., et al., Respondents.

FRAUDULENT CONVEYANCES — EXCHANGE OF LANDS — DIFFERENCE IN VALUES OF PROPERTIES—VALUABLE CONSIDERATION.—Where it appears in an action to set aside an alleged fraudulent conveyance, made by an insolvent father to his son, that the grantor conveyed real estate of the value of one hundred and seventy thousand dollars and received in exchange a conveyance from the grantee of real estate valued at one hundred and sixty-six thousand dollars, the father's conveyance will be regarded as supported by a valuable consideration, the difference in the values of the properties being so slight as not to affect the question.

ID.—INTENT TO DEFRAUD—BURDEN OF PROOF.—In such case it is incumbent upon the plaintiff to show that the conveyance, notwithstanding it was based upon a valuable consideration, was made by the father with intent to defraud his creditors, and that the son had knowledge of such fraudulent intent and took the conveyance in aid thereof.

ID.—INSOLVENCY OF GRANTOR—KNOWLEDGE OF GRANTEE—INTENT TO DEFRAUD.—Where an insolvent conveys real properties to his son in exchange for property of substantially the same value, the purpose of the transfers being to consolidate the holdings of the father and son so that certain ranches can be sold to pay the father's indebtedness to certain creditors, the father's insolvency at the time of the conveyances, and the son's knowledge thereof, do not raise a presumption that the father was attempting to defraud other creditors and that the son was aware of it.

ID.—PREFERENCE OF CREDITORS—KNOWLEDGE OF GRANTEE.—The fact that by such transaction the father preferred certain creditors, and the son knew it, does not show that the father intended to defraud his creditors or that the son was aware of such intent and joined therein.

Id.—Failure to Record Deeds—Whether Evidence of Fraud.—The fact that the deeds were not recorded until several months after their execution, does not constitute *prima facie* evidence of a fraudulent intent on the part of the son in taking the conveyances; there being legitimate reasons for the delay, and no concealment of the transfers and no deception of creditors thereby.

Id.—Evidence of Fraud—Payment of Taxes—Fund from Which Made.—The fact that in paying taxes on the properties conveyed to him the son sometimes drew on a bank account standing in the name of the father, does not show fraudulent intent, where the father and his sons had for years, by an arrangement between themselves and the bank, drawn checks on such account and had paid their respective taxes by checking thereon.

Id.—Possession of Property—Retention by Grantor as Evidence of Fraud.—The fact that the father remained in the possession and assisted in the management of the property after conveying it to his son does not indicate fraud, where the son was also in possession, and the father was advanced in age and previously for many years had there made his home and been associated with the son in business. While it is true that the retention by the grantor of the possession of property transferred may under some circumstances affect the *bona fides* of the transaction, yet when, from the relationship of the parties and their former business associations it might be expected naturally that the grantor would remain upon the property and assist in its management, the fact that there was no change following the transfer is not evidence that it was not made in good faith.

Id.—Evidence of Fraud—Declarations of Grantor.—Declarations of the father, made after the transaction, to the effect that the conveyances were "made for financial reasons" and that the property was "still his," are inadmissible in an action to set aside such transfers, in the absence of any evidence of a combination or common purpose on the part of both parties to defraud the father's creditors.

Id.—Pleading—Amendment of Complaint—Refusal in Case of Unexplained Delay.—It is not an abuse of discretion to refuse leave to amend the complaint in such action a year after the answers were filed, where the facts upon which the proposed amendments are based were known to the plaintiff for over a year and no satisfactory showing is made why leave was not sought earlier.

APPEAL from a judgment of the Superior Court of Tehama County and from an order refusing a new trial. John F. Ellison, Judge.

The facts are stated in the opinion of the court.

Morrison, Dunne & Brobeck, John J. Wells, and Edward Lynch, *Amicus Curiae,* for Appellant.

Charles W. Slack, and W. P. Johnson, for Respondents.

LORIGAN, J.—This is an appeal from portions of a judgment in favor of the defendant Simpson Finnell and from an order denying a new trial as to certain issues found in his favor.

The complaint alleged that one John Finnell between 1893 and the time of his death in October, 1905, was indebted to plaintiff in a sum amounting to $62,178; that during this whole period said John Finnell was insolvent; that in the year 1895 said John Finnell conceived a plan, purpose, and design of defrauding his creditors, particularly plaintiff, and pursuant thereto while insolvent and in contemplation of insolvency and with such intent and purpose, made certain conveyances dated September 20, 1900, to the defendants, his sons, one to James and Bush ·Finnell of certain described lands in Tehama and Mendocino counties, another to John Finnell, Jr., of a tract of land in Tehama County, and still another of lands in the same county to John Finnell, Jr., and Simpson Finnell as tenants in common. It is then further alleged that said John Finnell while insolvent and with the same design, purpose, and intent and on or about January 25, 1899, made and delivered to said Simpson Finnell, three other deeds, the first of land in Tehama County, the second and third describing certain different tracts of land in Napa County. Then proceeding, it is alleged that when all these conveyances were made to defendants, they each knew that said John Finnell was insolvent and each of said conveyances was made without consideration and with intent to hinder, delay, and defraud the creditors of said John Finnell. The relief asked was that all of said conveyances be set aside and vacated.

Each of the defendants filed an answer making general denials to the complaint and setting up the defenses of the statute of limitations and laches.

The court found that the conveyances of September 20, 1900, to James, Bush, and John Finnell, Jr., and to John Finnell, Jr., and Simpson, as tenants in common, were made without consideration and while John Finnell was insolvent,

and adjudged them fraudulent and void. A separate appeal was taken to this court by the defendants from the decree entered as to these particular conveyances and the judgment was here affirmed, 166 Cal. 546, [137 Pac. 241].

As to the three conveyances made January 25, 1899, to Simpson Finnell individually, the court found that they were made and accepted by said Simpson Finnell at a time when said John Finnell was insolvent and in contemplation of insolvency, and when Simpson Finnell knew that his grantor was insolvent; that such conveyances to Simpson Finnell were not made without consideration nor with any intent to defraud any creditor of said John Finnell, deceased, and were not fraudulent and void.

The present appeal is from that part of the decree which adjudges that the conveyances of January 25, 1899, to Simpson Finnell were not void and from the order denying a new trial of the issues as to such conveyances.

The contention of the appellant is that the finding that these conveyances to Simpson were made without intent to defraud is not sustained by the evidence. It further is urged that the court erred in excluding evidence offered by appellant of declarations of John Finnell made after the execution of the conveyances to Simpson Finnell and likewise erred in refusing plaintiff permission to amend his complaint in certain particulars.

There can be no question but that under the evidence the court was fully warranted in finding that the transfers to Simpson by his father were not without consideration. There was, it is true, conflicting testimony on values, but certainly there was evidence as accepted by the court, to show approximately full consideration given by Simpson for the lands conveyed to him. Simpson had for many years prior to these transfers to him been the owner of large tracts of land consisting of what were known as the McClure Ranch, the Chard Ranch and an interest in the Home Ranch, and these he transferred to John Finnell in exchange for. what was known as the Newville Ranch, the Yountville Ranch and the Saffold place, being the lands in the conveyances here attacked. There was evidence showing that the value of the lands conveyed by Simpson to his father was one hundred and sixty-six thousand six hundred and five dollars; that the value of the

lands transferred to Simpson by his father one hundred and seventy thousand dollars. While there is a difference in the value of the lands exchanged, that difference is so slight as not to affect the question of valuable consideration. It appearing therefore that the conveyances were supported by a valuable consideration it was incumbent upon the plaintiff to show that the conveyances, notwithstanding they were made for a valuable consideration, were made by John Finnell with intent to defraud his creditors, that Simpson Finnell had knowledge of such intent when he took them, and took them in aid of the fraudulent intent of his father (*Roberts* v. *Burr,* 135 Cal. 156, [67 Pac. 46].) The finding was against appellant as to such intent and this is the finding to which he directs his sole attack, insisting that notwithstanding there was a consideration for the conveyances, still from other facts, either found by the court or fully sustained by the evidence, there was established such an extremely strong case of fraudulent intent that the finding of the court to the contrary was erroneous.

In this regard appellant insists that there are a number of facts appearing from the evidence which he denominates ''badges of fraud'' and which he discusses and claims are of such persuasive character and potency as establishing fraudulent intent that the finding to the contrary cannot be sustained.

Among other such facts and circumstances marshalled and more particularly relied on as evidence of fraud are the findings of the court that John Finnell was insolvent when he made the conveyances to Simpson and that the latter knew it; that these conveyances to Simpson particularly involved here were withheld from record by him for an excessive length of time; that the various conveyances involved in this action amounted to a transfer of practically all the property of the grantor; and that John Finnell after the transfers to Simpson remained in possession and management of the properties described therein and paid the taxes thereon.

It is insisted that though the conveyances to Simpson Finnell were for a valuable consideration, still when these matters relied on as *indicia* of fraud are given their due weight, they constitute persuasive evidence that the conveyances were made with fraudulent intent. No doubt in the absence of

other controlling facts or explanatory circumstances, they would be sufficient to justify a finding of such fraudulent intent, but here under all the evidence relating to them they cannot be said to be as controlling as appellant conceives them to be.

As to the finding by the court that John Finnell was insolvent when he made these conveyances and that Simpson knew it. This fact, when we consider the circumstances under which the exchange of properties between them was made, did not raise a presumption of law or even an inference of fact that John Finnell was attempting to defraud his creditors or that if he was, Simpson was aware of it. The facts are that in January, 1898, John Finnell owed the James H. Goodman & Company Bank and George E. Goodman the sum of six hundred and fifty thousand dollars. The bank officials were trying to effect a settlement of this indebtedness and in discussing the matter with John Finnell the officers of the bank expressed the opinion that if all the separate holdings of John Finnell and Simpson Finnell in what were known as the Saucos and Flores Ranchos should be consolidated, those ranchos could be sold and John Finnell's indebtedness paid. The Chard place was a portion of the Flores Rancho and the McClure Ranch and the Home Ranch were portions of the Saucos Rancho. These tracts, though only an interest in the home place, were owned by Simpson Finnell and the contemplated consolidation of the ranchos could not be accomplished without acquiring the interest of Simpson in these tracts. The bank directors suggested to John Finnell that he acquire these tracts from Simpson, and acting under that suggestion John Finnell obtained the promise of Simpson to convey them to him in exchange for the lands embraced in the conveyances in controversy here, and so informed the bank officials. The conveyances under this agreement were made between John Finnell and Simpson. An attempt to sell the consolidated ranchos was ineffectual and a corporation called the Finnell Land Company was formed, to which John Finnell conveyed the lands acquired from Simpson, together with other lands. On the formation of the corporation the indebtedness of John Finnell to the bank and George E. Goodman was paid and canceled by the transfer to them of certain shares of stock of the corporation and the delivery by John

Finnell to them of certain personal property. Simpson Fin-
nell testified that in making the exchange of deeds with his
father he had no knowledge on the part of his father of any
intent on his part, if it existed, to hinder, delay, or defraud
any of his credtors, and in making such exchange he himself
had no intention of aiding in doing so. No doubt John Fin-
nell while insolvent, as he was at this time, intended, in pro-
curing a consolidation of the ranchos through the exchange
of properties with Simpson and a sale of the consolidated
ranchos, to pay his indebtedness to the bank and Goodman
and so gave a preference to these creditors. This, too, Simp-
son doubtless knew, but this itself was not evidence of fraudu-
lent intent, because a debtor, though insolvent, may lawfully
prefer one creditor over another. Under this evidence of the
circumstances under which the conveyances were exchanged,
the trial court might properly conclude that the fact that
John Finnell was insolvent when he made the conveyances
to Simpson and the latter knew it was of no potency what-
ever as evidence of an intent on the part of John Finnell
to defraud his creditors or evidence of any force at all that
Simpson was aware of such intent and joined in it. (*Alber-
toli* v. *Branham,* 80 Cal. 631, [13 Am. St. Rep. 200, 22 Pac.
404].)

It is further insisted that as making a *prima facie* case of
fraud is the fact that these conveyances were not recorded
for a long time. But under the circumstances shown, the
deeds were not withheld from record for such a length of
time as would indicate a fraudulent intent in making them.
We have already stated the circumstances under which and
the purpose for which John Finnell and Simpson agreed to
exchange their properties. In January, 1898, after the deeds
of exchange were made they were delivered to the cashier of
the Goodman bank to be held by him until it might be deter-
mined whether a sale of the consolidated ranchos could be
made or whether it would be necessary to form a corporation.
No sale was effected and the Finnell Land Company was in-
corporated. When this was done and on May 29, 1900, the
cashier delivered the deeds to the respective Finnell grantees,
but to Simpson only two of the three in his favor—namely,
those for the Newville and Yountville properties. These two
deeds were recorded by Simpson three months later, in Sep-

tember, 1900. As to the deed to Simpson for the Saffold
place, it appears that in October or November, 1899, while
that deed was being held by the cashier of the bank, some
litigation arose between one Saffold and John Finnell involv-
ing title to the Saffold place. In anticipation of this suit
it was agreed between John Finnell and Simpson that the
deed to this tract handed to the cashier should be withdrawn
from the agreement and returned to John Finnell to be de-
livered to Simpson after the litigation was over. That litiga-
tion was not settled until 1902, after which the deed was
delivered to Simpson and by him recorded in May, 1902.
There was no evidence of any efforts at concealment of these
transfers—they seem to have been known to many persons—
and it does not appear that during the few months they were
held from recordation after delivery that any creditor was
deceived by failure to do so. The evidence clearly explains
why they were not recorded at the time they bore date and
all were recorded within three months after they were deliv-
ered. This period of delay cannot be said to have been ex-
cessive or unreasonable or sufficient to constitute *prima facie*
evidence of a fraudulent intent on the part of Simpson in
taking the conveyances.

It is further contended that a *prima facie* case of fraud
proceeds from the fact as asserted by appellant that the con-
veyances here in question (including those to the other de-
fendants and Simpson) amounted to a transfer by John Fin-
nell of practically all his property. Of course, the transfer
by an insolvent of all his property is a proper circumstance
to be considered as evidence tending to show that it was in
fraud of his creditors. But under the evidence here this
contention by plaintiff has no force, because, as has been
pointed out, after all the transfers in question were made by
John Finnell, he still owned enough property to pay off an in-
debtedness exceeding six hundred and fifty thousand dollars.

It is insisted in this same line that the the evidence shows
that the taxes on this property were paid by John Finnell
after the transfers. But it does not appear that the taxes
were paid with the money of John Finnell. They were gen-
erally paid by Simpson Finnell by check on his own bank.
It is claimed, however, that some of these taxes were paid out
of a bank account standing in the name of John Finnell.

CLXVII Cal.—7

This is true, but under the evidence respecting this bank account it can hardly be claimed that the payments were made from the funds of John Finnell. It appears that John Finnell and his sons had always been closely associated and worked together practically all their lives. For many years prior and subsequent to the transfers there was an account in the Tehama bank in the name of John Finnell against which he and his sons, John, Jr., and Simpson, drew checks under an arrangement between themselves and the bank. The account was guaranteed to the bank by John Jr., and Simpson, and both deposited to this account. They had during all these years paid their respective taxes by checking on it, and Simpson, in some instances, continued to do so, paying his taxes thereby on the property here in question after the transfers to him. With this explanation there is nothing in the circumstance of payment out of that bank fund which should impeach the good faith of Simpson in acquiring the property.

As further evidence of fraud it is insisted that after the transfers to Simpson, John Finnell, to all outward appearances, still continued to manage the property as if it were his own.

At this period John Finnell was an old man and incapable of much physical exertion, though his business capacity was not impaired. His advanced age precluded him from as actively doing business as in his earlier years, but by reason of his business experience he could attend to matters connected with these properties, consisting principally of leasing them and attending to sales of live stock. It would have been unnatural conduct for Simpson to have turned his father away in his old age from the home where he and his sons had always lived from earliest years. Nor was he required to deny himself the benefit of the experience and business capacity of his father. Simpson was actively engaged in the purchase and sale of stock and in the better conduct of that business which called him away, could leave the general management of the properties, inasmuch as it required little physical exertion, to his father whose experience qualified him for attending to it. In such management it does not appear that John Finnell was doing it for his own interest but solely in the interest of Simpson. John Finnell did not pretend to be

still the owner of the property.   As one of the witnesses testi-
fied: "He (John Finnell) explained to me that the reason he
was around then was that Simpson was busy buying and sell-
ing cattle and handling other business that was more im-
portant than this.   That he was able to attend to this business
(leasing the land) while he was not able to go out and rus-
tle around like Simpson."   The deeds of the property were
then on record.   The evidence shows, as we have heretofore
stated, that the transfers were known to many persons, and
the evidence also shows that they were known for years
before this action was brought to the confidential agent of the
plaintiff in this state.   While it is true that the retention by
the grantor of the possession of property transferred may
under some circumstances affect the *bona fides* of the transac-
tion, yet when, from the relationship of the parties and their
former business associations it might be expected naturally
that the grantor would remain upon the property and assist
in its management, the fact that there was no change follow-
ing the transfer would not be evidence that it was not made
in good faith.   While John Finnell assisted in the manage-
ment of the property and negotiated with prospective tenants
for the leases of portions of it, no contracts in that respect
were made by John Finnell without the approval of Simp-
son who made the leases and received the rents.   It appears
that John Finnell negotiated for sales of cattle on the ranches,
but Simpson was present usually during the negotiations and
when the sales were consummated received the money there-
for.   Such improvements as were made on the property were
paid for by Simpson.   Here the most that the evidence shows
is that while John Finnell remained in possession, Simpson
was also in possession and that the possession of John Finnell
was solely that of a manager of the property in Simpson's
interest and behalf.

   These are the principal matters which it is claimed by ap-
pellant constitute such clear *indicia* of fraud that the finding
of the court that the conveyances were not made with intent
to defraud creditors must be held not to be sustained.   But,
as has been shown, all the facts surrounding the making of
these transfers, the circumstances which induced them and
the conduct of these parties subsequent to the transfers were
fully presented to the court and covered the various matters

insisted on here as "badges of fraud." They amounted, at
the most, to nothing more than evidence more or less per-
suasive of fraud to be considered by the court. It consid-
ered and weighed them in connection with the other evidence
in the case and was satisfied that they were not of the per-
suasive character which appellant attributes to them, and
upon the consideration we have given them we cannot say
that the trial court was not right. As it was clearly estab-
lished by the evidence that the deeds to Simpson were for a
valuable consideration, the only other question was upon the
intent with which they were made—whether fraudulent or
not. Simpson testified that he knew of no intention on the
part of his father to defraud his creditors and that he did not
take the conveyances in aid of such an intent on the part of
his father if it existed; that he transferred property he owned
of equal value to his father in exchange for the property in
controversy, his father desiring at the suggestion of the bank
to which he was indebted to thereby consolidate certain
ranchos and sell them to pay an existing indebtedness to the
bank and Goodman which they wished satisfied. While the
appellant insists that this evidence sustaining the *bona fides*
of the transfers should not be credited because of the vari-
ous matters which he relies on as badges of fraud showing
fraudulent intent, it was nevertheless a question for the court
to determine the weight and effect which should be given to
them. It did not consider that they were sufficient to estab-
lish fraudulent intent, but from all the evidence in the case
was satisfied that the transfers were made in good faith with-
out intent to defraud and we cannot say on a consideration of
the evidence that the finding of the court to that effect was
not sustained by it.

As to alleged errors in the rulings of the court:

The court excluded testimony given in a deposition of a
daughter of John Finnell that her father had told her that
the conveyances to Simpson were "made for financial rea-
sons" and that the property was "still his property although
it had been conveyed to Simpson." Appellant claims these
declarations were admissible because John Finnell was in pos-
session of the property when he made them. It is well estab-
lished as a general proposition that declarations of a grantor
made after conveyance by him are inadmissible in disparage-

ment of or to impugn the title conveyed. Appellant admits this, but insists that an exception to the general rule is recognized where the evidence shows a combination or conspiracy on the part of the grantor and grantee to perpetrate a fraud on the creditors of the grantor by concealing his property from them, and he says that in the present case when these declarations were offered there was sufficient evidence *prima facie* to show such a combination or conspiracy which rendered them admissible within the exception recognized and applied in *Bush* v. *Helbing*, 134 Cal. 676, [66 Pac. 967]. In the cited case, however, it is clear that there was a conspiracy between the husband and wife to defraud the creditors of the husband. The deed to the wife was without consideration and was not recorded until the plaintiff creditor had advanced materials for the repairs of a building on the property, believing, as the record showed, that the husband owned it; the making of the deed was secret and the knowledge thereof rested solely in the breasts of the husband and wife. It was held that a combination to defraud being apparent from the secrecy with which the transaction was hidden, the declarations of the husband while in possession were admissible against the wife, his grantee. But in the case at bar there was no secrecy in the transaction between Simpson and his father and the transfers were for a valuable consideration and recorded within a short while after being delivered and were so on the public records for many years before this action was brought. As heretofore stated, a large number of persons knew of them, as well as the confidential agent of the plaintiff. True, John Finnell was in possession of the property, but he was only there managing it for Simpson who was himself also in possession. Under these circumstances the rule of the Bush case would not apply as is pointed out in that very case itself. Before the trial court would be warranted in admitting the declarations of John Finnell it must appear to it that the evidence showed *prima facie,* at least, that there was a combination or common purpose on the part of John Finnell and Simpson to defraud the creditors of the latter. In rejecting the offered testimony the court was satisfied that there was no such sufficient showing and from an examination of the evidence we cannot say this conclusion was not justified.

Appellant assigns as error the refusal of the court to grant

him leave to amend his complaint. Leave to amend the complaint after demurrer or answer rests in the sound discretion of the trial court and an order denying leave will not be disturbed except for abuse of such discretion.

A year after the answers to the amended complaint were filed and on the day when the case was set for trial the motion was made. The proposed amendments attacked transfers by John Finnell of personal property of large value and a transfer to his sons of tracts of land on the ground that they were fraudulently made. None of these properties were mentioned in the complaint. The motion was resisted on the ground that it was made too late and that the amendments as proposed introduced new causes of action. The court made a general order denying the motion. Without considering whether the proposed amendment embraced new causes of action, the order was justified on the ground that the motion was made too late. It appears that the facts upon which the proposed amendments were based were known to plaintiff for over a year. There was no satisfactory showing why leave to amend was not sought earlier, and it was within the discretion of the court to refuse to allow them for this unreasonable and unexplained delay.

A brief of *amicus curiae* has been filed joining with appellant in urging a reversal of the judgment. He represents appellant in actions brought against the defendants here subsequent to the order refusing leave to plaintiff to amend. These actions relate to the alleged fraudulent transfers by John Finnell of the property which the amendments were designed to include. The only point made by him aside from those made by counsel for appellant and already disposed of relate to rulings refusing to admit testimony as to transactions involving a transfer of the capital stock of the Finnell Company. We do not perceive that this matter is at all involved in this case and the rulings of the court were therefore correct.

The judgment and order appealed from are affirmed.

Henshaw, J., and Melvin, J., concurred.

Hearing in Bank denied.