[S. F. No. 14587. In Bank.—June 3, 1932.]

R. J. WALSH, Respondent, v. STANDARD ACCIDENT INSURANCE CO. (a Corporation), Appellant.

Myrick & Deering and Scott for Appellant.

Joseph G. DeForest, Hartley F. Peart and Horace W. B. Smith, as *Amici Curiae* on behalf of Appellant.

Goldman & Altman for Respondent.

PRESTON, J.—Appeal by defendant from judgment for plaintiff in an action to recover upon a broker's bond. The main question to be determined is whether or not the transaction upon which the cause of action is based was a "brokerage" transaction within the meaning of the Corporate Securities Act and covered by the bond issued in accordance with the requirements of said act (sec. 5, Corporate Securities Act, as amended in 1925, Stats. 1925, p. 967).

The amended complaint alleged that on December 6, 1926, J. Arthur Snowden, doing business as The J. Arthur Snowden Company, as principal, and defendant, as surety, executed and delivered a $5,000 bond to the commissioner of corporations as a condition precedent to the issuance to said Snowden of a broker's license under said act. The condition of the bond, in almost the identical language of the statute, was that if said Snowden should faithfully and honestly perform all obligations and undertakings in the purchase or sale of securities by him, then the obligation of the bond should be void, otherwise to remain in full force and

effect and that any person injured might bring an action in his own name upon it to recover damages.

Said complaint further alleged that on and prior to January 28, 1927, J. Arthur Snowden purported to be the fiscal agent of James K. Nelson, Inc., engaged in the business of purchasing and selling its capital stock, of which 238 shares were owned by plaintiff; that on said day Snowden told plaintiff he desired to purchase his 238 shares for the purpose of reselling them to investors; that an agreement was thereupon entered into whereby a purchase price of $6,000 was fixed, $2,000 of which said Snowden paid plaintiff in cash, giving a thirty-day promissory note for $4,000 to cover the balance; that said Snowden failed, refused and neglected to pay said $4,000 note when due or at all and that plaintiff therefore commenced an action against him in the superior court and recovered judgment for $4,872.85, no part of which has been paid or satisfied, wherefore plaintiff prayed judgment in this action against defendant surety company upon said bond for said sum of $4,872.85, interest and costs.

Issue was joined and the cause went to trial. The evidence included the judgment-roll and part of the testimony taken in the action brought by plaintiff against said Snowden. At the conclusion of the trial, the court found that the allegations of said amended complaint were true and supported by competent evidence. Judgment, accordingly, went for plaintiff, and defendant appealed.

█ Appellant claims that obviously this transaction was not a brokerage transaction within the meaning of said act and the terms of the bond, but that it was a straight sale of stock by plaintiff to said Snowden as a principal and not as a broker. From the very essence of its relationship, appellant argues, brokerage implies the existence of a principal, and a broker is and always has been one who acts as agent for another. Respondent relies upon the finding that said Snowden purchased the stock for resale to investors and urges that the common-law definition of an ordinary broker has been abrogated by the more liberal definition contained in the act itself, to which latter definition we must look when passing upon the scope of the provisions of a bond issued thereunder. The definition referred to (sec. 2, subd. 11, of said act) reads in part: "The word 'broker', as used

in this act, includes every person or company, other than an agent, who shall . . . .engage either wholly or in part in the business of selling . . . negotiating for the sale of, or otherwise dealing in any . . . 'securities' issued by others, . . . or of purchasing such 'securities' *with the purpose of reselling them, or of offering them for sale to the public."*

Clearly this was not a transaction between plaintiff and Snowden, as an individual, and in reality it was more than a purchase for resale, for the evidence establishes beyond a doubt that Snowden was in fact acting in the interests of the Nelson Company, as its broker or agent, in the pursuit of his regular brokerage business, and that his admitted purpose in making the purchase was not to resell to the public, but primarily to protect the proposed market price of the remainder of the capital stock of the Nelson Company, which he was endeavoring to promote.

Mr. Snowden gave a complete history of his relationship with the Nelson Company. He stated that just as he was completing the successful financing of a certain interlocking transportation company, the president of said company, who was also a director of the Nelson Company, consulted him with reference to procuring capital for expansion of the latter company, representing that it was financially sound; that it was about to secure a permit for the sale of treasury stock to increase its capitalization, but that pending the issuance of such permit, Mr. Nelson was willing to advance for sale $100,000 worth of issued stock which he personally owned and to transfer the proceeds to the company in return for an account receivable; that when the legality of the increased capitalization was completed, he would then ask for the right to take back stock from the treasury for said account receivable, thus eliminating the obligation on the books of the company, but giving it the interim funds. Mr. Snowden testified that he thereupon investigated the Nelson Company with the result that in the spring of 1926, in aid of the above plan, he was given a written option to purchase the personal stock of Mr. Nelson at a gross cost of $100 per share, that is, he was to pay Mr. Nelson $75 per share in cash and was to set up an account receivable in his favor of $25 a share additional to be paid when the ·new release of treasury stock should be authorized and the Snowden Company should receive for sale to the public a

block thereof large enough to give it a fiscal operation of some importance. The price at which the stock taken under the option agreement was to be sold to the public, based upon the principal assets of the company, was fixed at $125 per share.

Mr. Snowden testified that the financing of this company was his major business from May, 1926, to January, 1927; that for several weeks prior to January 28, 1927, he had been told by Mr. Nelson, by the director of the Nelson Company above mentioned and by another interested party, that plaintiff owned 238 shares of its capital stock, which he contemplated dumping on the open market; that, therefore, about January 28th, he telephoned plaintiff, who in response came to his office, stating that he had made a loan of $6,000 on his 238 shares of stock and would sell them for that amount in cash. Plaintiff testified: "Mr. Snowden told me that he was in a position to purchase that stock, and I told him that I had wanted to get rid of the stock. 'Well,' he says, 'I am the only one who has got a place to put it.' 'Well,' I says, 'I will tell you, I have been working with Jimmy Nelson, the president of your organization, and he was negotiating to buy it.' He said, 'I am working 100% with Jimmy Nelson, and we have got a place to put the stock,' etc. Mr. Snowden testified that he could pay plaintiff only $2,000 in cash, so the transaction was consummated by the giving of his note for $4,000 to cover the balance. Plaintiff and Mr. Snowden then went to the bank and placed the stock and note in escrow for thirty days, at the end of which time the note was to be paid and the stock delivered. The escrow agreement expressly provided that no rescission thereof should be made without the consent in writing of all the parties. On the very next day, January 29th, Mr. Snowden learned that the Nelson Company was in financial difficulties and he endeavored to rescind his escrow agreement and get back his note and $2,000 cash payment. The stock became worthless and plaintiff refused to consent to any rescission. The note was never paid and this litigation resulted.

Aside from Mr. Snowden's testimony that his major business was that of fiscal agent for the Nelson Company, his office door, at the time in question, advertised that he and his company were "Financial Agents of James K. Nelson,

Incorporated.'' He also issued a lengthy prospectus, setting forth the assets and prospects of the company, wherein he offered its stock for sale and represented: ''These are the only shares of the company in any way available at this time. . . . Practically a closed corporation. Never a public offering of its securities. . . . A most limited number of shares are available for purchase. . . . '' In view of these representations, it was obviously to the best interests of Mr. Snowden, as a broker, and as financial agent of the Nelson Company, to prevent, if possible, the marketing of the shares held by plaintiff. Moreover, Mr. Snowden testified directly that such was his real purpose.

He stated: ''I remember telling him (plaintiff) that these three officers of the company had been bedeviling me for several weeks with the fact that he owned this stock and was going to throw it on the market at a ridiculous price, thereby damaging our market, and that was why I was interested in discussing it with him. Q. When you say by dumping the stock he would damage 'our market' you refer to your ability to resell the stock of Mr. Nelson. . . . A. Yes, obviously if he had stock which he had acquired at a few cents on the dollar and dumped it and advertised it in the newspapers, he would damage the existing sale price of the stock, justified by its book value. . . . Q. As I understand it, your reason for buying the stock was to prevent the dumping of the stock so as to interfere with your operations in the sale of the stock of the company; is that correct? A. That is one reason; the other was that it was in the general line of our business of buying and selling stocks. Q. So that it was your policy, when you were engaged in the sale of stock of the corporation, to remove from the market any floating supply of stock; is that correct? A. No, that is not correct. Q. Just so that I will get it correct, what was your interest in buying this stock? A. The interest was accelerated by these three officers of the company urging us to absorb that stock so that he would not at a sacrifice price reflect upon the book value and market value of the stock then existing. Q. So it was to your interest to see that that stock was not sold on the market at a price such as Mr. Walsh sold to you for? A. It would have been to our interest had the company not

collapsed and the new issue of stock been released and offered to the public. Q. You did not know anything about the collapse of the company at the time you agreed to buy this stock of Mr. Walsh? A. No, sir.''

It appears too clearly for controversy, even from the excerpts of testimony above set forth, that said Snowden, in purchasing the stock from plaintiff, was endeavoring to protect the market for the remainder of the stock which he was financing and that it was undoubtedly a transaction in the course of his regular brokerage business. The market would undoubtedly have been injured by a sale of 238 shares of stock for $6,000—about $25 a share or one-fifth of the alleged book value of $125 per share. In this connection, Mr. Snowden testified: ''Q. Did you ever figure out at what price per share you were paying Mr. Walsh for this stock. A. No, sir, I never did. . . . I never figured it. Q. There were 238 shares for which you were paying $6,000, and $25 a share would be a little less than $6,000. . . . Did you tell Mr. Walsh when he offered to sell this stock to you at approximately $25 a share that the book value of the stock was over $125 a share. A. I don't know as I did. . . . Q. Until this morning you say you have never attempted to figure what prices per share you were paying for this stock? A. Frankly, I never did. Q. Did you know it was approximately one-fifth of the price you were selling the stock for? A. I never arrived at that conclusion. I knew it was a reasonable price for the stock.''

Appellant urges a construction of the said act which would exclude its application to a private transaction between a broker and another and urges the invalidity of the act if such construction is compelled by it. But we have thus gone at length into the facts of this case, which show that the broker here was not acting in his individual capacity, but purely as a broker, as defined by the act. ■ The fact that the relation of principal and agent did not exist between plaintiff and the broker does not seem to be controlling so long as the broker, in the transaction, was acting strictly in that capacity and not in his individual capacity. The regulation under the act is in the interest of the general public and this remedy to the injured party is a part of the regulatory scheme. ■ Under this legis-

lation, both benefits and burdens result to trustworthy members of the class, but the public are entitled to protection from the unworthy members thereof and the business is, therefore, a proper subject for police regulation. The provision requiring a bond for the faithful and honest performance of "all obligations and undertakings in the purchase or sale of securities" is distinctly germane to and in aid of this regulation. A wealth of authority could be cited in support of this principle. See, among other cases, the following: *In re Cardinal,* 170 Cal. 519, 524 [L. R. A. 1915F, 850, 150 Pac. 348]; *People* v. *Eiseman,* 78 Cal. App. 223, 249 [248 Pac. 716]; *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539 [Ann. Cas. 1917C, 643, L. R. A. 1917F, 514, 61 L. Ed. 480, 37 Sup. Ct. Rep. 217]; *Caldwell* v. *Sioux Falls,* 242 U. S. 559 [61 L. Ed. 493, 37 Sup. Ct. Rep. 224]; *Merrick* v. *Halsey & Co.,* 242 U. S. 568 [61 L. Ed. 498, 37 Sup. Ct. Rep. 227.]

The title of the act is quite sufficient to authorize this legislation. (*McClure* v. *Riley,* 198 Cal. 23 [243 Pac. 429], *Estate of Wellings,* 192 Cal. 506 [221 Pac. 628], and *Heron* v. *Riley,* 209 Cal. 507 [289 Pac. 160].)

Without further comment, we may state in conclusion that the above review of the evidence shows clearly the correctness of the findings and judgment of the trial court.

The judgment is affirmed.

Curtis, J., Tyler, J., *pro tem.,* and Waste, C. J., concurred.

Rehearing denied.