[Civ. No. 1753.   Fourth Appellate District.—May 14, 1936.]

R. S. BETZER, Plaintiff and Respondent, v. T. M. OLNEY et al., Defendants and Respondents; COMMERCE CASUALTY COMPANY et al., Defendants and Appellants; L. H. KOFAHL, Trustee, etc., Intervener and Appellant.

J. W. Heard, Jr., and Thomas E. Davis for Defendants and Appellants.

Calvin H. Conron, Jr., for Intervener and Appellant.

Harvey & Johnston for Plaintiff and Respondent.

Edward West and J. K. Lilly for Defendants and Respondents.

BARNARD, P. J.—This is an action to recover upon a broker's bond for $5,000, issued in accordance with the requirements of subdivision 3 of section 6 of the Corporate Securities Act, as amended (Stats. 1931, p. 944). The action involves three transactions had by the plaintiff and cross-complainants, respectively, with the brokerage firm of W. P. Smith & Company, for which firm the corporate defendants had furnished the bond in question. The trustee of the bankrupt estate of W. P. Smith & Company filed a complaint in intervention, claiming the right to administer any amount recovered upon the bond. The court found in favor of the three claimants, finding that Betzer was entitled to $3,363.43, Olney to $1710.86, and Dorrance to $2,812.50. The amount of the bond was prorated between the three claimants, and judgment was entered awarding Betzer $2,132.32, Olney $1,084.64, and Dorrance $1783.04. From this judgment the sureties on the bond and the intervener have appealed, the two appeals having been consolidated.

With respect to the three transactions in question the following facts appear from the court's findings: On February 6, 1932, Betzer borrowed $875 from the brokers and deposited with them as security for the loan sixty-six shares of Standard Oil stock. On February 9, 1932, the brokers sold these shares and appropriated the proceeds. On April 13, 1932, Betzer deposited with the brokers an additional sixty-one shares of said stock as further security for the loan of $875 and as security for another loan of $450. On April

15, 1932, the brokers sold these shares and appropriated the proceeds. Betzer discovered the fact that his stock had been converted and sold on July 19, 1933, at which time the brokerage firm went into insolvency.

On January 5, 1932, Olney borrowed $2,200 from W. P. Smith and as security for the loan deposited with Smith ninety shares of Pacific Gas & Electric stock. On January 19, 1932, Smith sold fifty shares of said stock and appropriated the proceeds. On April 7, 1932, the brokerage firm of W. P. Smith & Company, which had succeeded to the business of W. P. Smith, sold the remaining forty shares of this stock and appropriated the proceeds. On April 30, 1932, the brokers demanded additional security for the loan and Olney deposited with them an additional twenty-four shares of said stock as such further security. On the same day the brokers sold these shares and appropriated the proceeds. The copartnership knew of the sale of the first fifty shares at the time it took over the business of W. P. Smith and the account of Olney. On January 23, 1933, Olney ordered the brokers to sell ten shares of the stock at $30 per share and they pretended they had done so and paid him $294.04 as the net proceeds. On February 5, 1933, Olney ordered the brokers to sell the remaining 104 shares at $30 per share, and on July 6, 1933, they reported that they had done so but no payment was made to him. Discovery of these conversions was made on July 19, 1933.

On March 17, 1932, Dorrance deposited with the brokers 100 shares of Texas Corporation stock to cover the purchase of fifty shares of Standard Oil stock. On March 28, 1932, the brokers sold these one hundred shares and appropriated the proceeds. On April 19, 1932, Dorrance paid the brokers $300, which amount they also appropriated. These conversions were discovered by Dorrance on July 19, 1933.

The bond in question was dated February 3, 1932, and it was admitted in the pleadings that it was in effect from and after that date and until December 31, 1932. The bond covered the copartners doing business as W. P. Smith & Company and in its conditions largely followed the language of subdivision 3 of section 6 of the Corporate Securities Act, as amended, in which the requirements for such a bond are set forth.

■ The first point raised by the corporate appellants, who were sureties on this bond, applies to the first two transactions referred to and is that these were loans and not brokerage transactions within the meaning of the Corporate Securities Act, and that the same were not covered by this bond, which was issued in compliance with the requirements of this act. With respect to such a bond this act provides as follows:

"Said bond shall be conditioned upon the strict compliance with the provisions of this act, the faithful performance by said broker of all his obligations under the terms and conditions of any installment purchase contracts involving the sale of a security, the honest and faithful application of all funds received and the faithful and honest performance of all obligations and undertakings in the purchase or sale of securities, by said broker, his agents and employees. Said bond shall be further conditioned upon the payment of all damages suffered by any person damaged or defrauded or by reason of the violation of any of the provisions of this act, or by reason of any fraud connected with or growing out of any transaction contemplated by the provisions of this act. Any person who sustains an injury covered by such bond, may in addition to any other remedy that he may have, bring an action in his own name upon said bond for the recovery of any damages sustained by him."

The respondents Betzer and Olney set up one cause of action based upon fraud and deceit on the part of the brokers in fraudulently representing that they must have additional security for these loans because of a decrease in the market value of the stock and in demanding and receiving such additional security, although the original stock pledged had already been sold. These respondents now contend that even though these transactions were originally loans which were not within the provisions of the Corporate Securities Act or the bond given in compliance therewith, the subsequent fraud and actions of the brokers in selling the securities thus pledged and in demanding and obtaining further security, bring the transactions within the purview of the act and of the bond. It is their contention that they come within the provisions of the statute requiring the bond to be conditioned upon the "honest and faithful application of all funds received and the faithful and honest performance of all obligations and undertakings in the purchase or sale of securities",

and "the payment of all damages suffered by any person damaged or defrauded—by reason of any fraud connected with or growing out of any transaction contemplated by the provisions of this act." They state in their brief "It is the plain intent of the legislature to broaden the conditions of the broker's bond for the general protection of the public dealing with such brokers, and to cover any fraudulent or unlawful transaction damaging members of the public dealing with the brokers and at their mercy, whether such fraud or wrong be a direct violation of the terms of the act or not."

In considering a. bond issued in compliance with the requirements of this act the court said, in *Sharp* v. *E. D. Leavitt & Co.*, 111 Cal. App. 634 [295 Pac. 1082, 1083]:

"We have quoted heretofore substantially the provisions of the bond in question, which follows the requirements of the act, and it is sufficient to say that the conditions required to be in the bond are tied directly into transactions under the act, which the lot deal is not. 'Strict compliance with the provisions of this act,' 'faithful and honest performance of all obligations and undertakings in the purchase or sale of securities', 'payment of all damages suffered by any person damaged or defrauded by reason of the violation of any of the provisions of this act or by reason of any fraud connected with or growing out of any transaction contemplated by the provisions of this act', is the language used, and the lot deal could not by any stretch of the imagination be held to be within the provisions of the act or a violation of any of them, or to be a transaction 'contemplated by the provisions' of the act."

In *Roberts, Thomas & Co.* v. *Allen*, 215 Cal. 595 [12 Pac. (2d) 451], it is said:

"It will be noted that under said act a broker's bond is required for the purpose of protecting persons injured by failure of a broker to perform 'obligations and undertakings in the purchase or sale of securities.' We take it to be evident that negotiations for the purchase or sale of securities must be pending and that the injured party must be the buyer or the seller therein before the provisions respecting a bond may be held to apply."

In *Walsh* v. *Standard Acc. Ins. Co.*, 215 Cal. 587 [12 Pac. (2d) 16], the contention was made that a broker, in agreeing to buy certain stock, was acting merely as an individual

and not as a broker, but it was held that the surrounding circumstances sufficiently disclosed that he was acting in that particular transaction as a broker and not as an individual.

There is nothing in the record before us to indicate that it is any part of the usual business of a broker to loan money on the security of stocks when the purchase or sale of other stocks is not involved. The act here in question does not purport to cover such a transaction, and the requirements for a bond definitely limit the conditions thereof to the faithful performance of "obligations and undertakings in the purchase or sale of securities" and to damages suffered by reason of the violation of the provisions of the act itself.

Turning to the evidence as to these two transactions, Betzer testified that he asked the First National Bank for a loan on his stock, that they offered him a loan for ninety days, that he wanted a loan for a year, that they said they were unable to make such a loan and referred him to W. P. Smith & Company, and that he borrowed the money from them on a yearly basis and gave them the stock as security. He further testified that in April he received a letter from W. P. Smith & Company saying stock prices were going down, that they would have to have more collateral or they would sell the stock. In response to this letter he borrowed more money and put up other stock as additional security on both loans. Olney testified that he told Smith that he had placed some stock as security with a bank, but the loan had been called; that he did not care to sell the stock on account of the low prices then prevailing, and that he wanted a loan to take up the loan with the bank. Smith made this loan and took over the stock as security therefor.

With respect to the injured parties in the first two transactions mentioned neither was the buyer or seller of stock through these brokers and no negotiations for the purchase or sale of securities were pending in so far as they were concerned. Neither desired to buy or sell any stock, and neither knew that his stock was being sold. In our opinion these were purely loan transactions which were not covered by the terms of the act or by the bond in question. The brokerage firm did not need a broker's license, or such a bond as this, in order to make such a loan, and the fact that they happened to have a license as brokers, and had posted

a bond pertaining to the same, cannot affect the situation or impose a new and different obligation upon the sureties on this bond.

The other points raised by the corporate appellants need be considered only in so far as they affect the Dorrance claim.

■ The contention that the bond in question, although executed on February 3, 1932, was not effective until a license was issued to the brokers, which did not occur until February 20, 1932, is not material on this claim because the same originated in the purchase of stock on March 17, 1932.

■ It is next contended that there is evidence in the record which would justify an inference that the partnership of W. P. Smith & Company did not take over the business theretofore. conducted by W. P. Smith until about April 1, 1932, that "The judgment includes a number of items representing the individual obligations of Smith" and that it was error to charge any such items against the surety for the partnership. This contention is without merit in so far as Dorrance's claim is concerned. The bond covered the copartners and, in any event, was in effect from February 20, 1932. The partnership agreement was recorded on February 16, 1932. The brokers could sell stock only by virtue of the license issued, and they sold this stock to Dorrance on March 17, 1932. If the argument that the judgment included individual obligations of Smith was intended to refer to the Dorrance claim, the evidence, with the reasonable inferences therefrom, is sufficient to support the findings to the contrary.

■ It is argued that the court erred in refusing to permit the sureties to interpose and prove the defense of laches. They offered an amendment on the last day of the trial which set up the claim of laches in that this action was not brought until after the expiration of six months from the time the brokers were adjudicated bankrupt, and that these appellants were deprived of their right to file their claim in the bankruptcy court. It may first be observed that the record indicates that the time for filing claims in the bankruptcy court had not expired when this action was brought. It not only appears that this defense could not have been successfully maintained, but the application for permission to amend was made on the last day of the trial and without notice to the adverse parties. (See sec. 473, Code Civ. Proc.) Under the circumstances, the granting of such permission was

a matter of discretion for the trial court (*Scholle* v. *Finnell*, 167 Cal. 90 [138 Pac. 746] ; *Cameron* v. *Ah Quong*, 175 Cal. 377 [165 Pac. 961] ; *Rogers Brothers Co.* v. *Beck*, 43 Cal. App. 110 [184 Pac. 515]).

▮ Finally these appellants contend that the court adopted the wrong measure of damages. The court took the value of the stock as of July 19, 1933, when a receiver was appointed for W. P. Smith & Company and when Dorrance first learned that his stock had been converted. It is contended that all conversions of this stock occurred prior to April 30, 1932, and that its value on that date should be taken as the measure of damage. They rely on that part of section 3336 of the Civil Code which provides that the damage for wrongful conversion of personal property is presumed to be its value at the time of conversion, with interest. They overlook the part of this section which immediately follows and which reads: ''or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted.'' The general rule is thus given in 26 R. C. L., at page 1148: ''The measure of damages in an action in trover is the value of the property at the time and place of conversion, with interest from that time, unless there are special circumstances which require a different measure of damages to be applied.'' There were such special circumstances here. Dorrance had borrowed money on his stock shortly before the conversions took place for the very reason that he did not desire to sell it. He did not want to sell it at any time up to July 19, 1933, and perhaps not then. Under such circumstances it would be a manifest injustice to take the value as of the date of conversion, and we think the facts bring this case squarely within the second provision of the code section which is above quoted. The date when a receiver was appointed and when the conversion was discovered may be taken as a time when a failure to make delivery occurred and the value of the stock at that time was properly taken in measuring the liability on this bond. (*Edwards* v. *Jenkins*, 214 Cal. 713 [7 Pac. (2d) 702].)

▮ With the claims of the respondents Betzer and Olney eliminated the respondent Dorrance was entitled to recover the full amount of his loss, as found by the court.

62

■ With respect to the appeal of the plaintiff in intervention, the appellant relies upon a part of section 47 (a) of the Bankruptcy Act, as amended in 1910, as giving to the estate of the bankrupt the right to administer any amounts recovered upon this bond. That section provides as follows:

''And such trustees, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a judgment creditor holding an execution duly returned unsatisfied.''

It is argued that this provision vests in the trustee all the rights, remedies and powers of a judgment-creditor with respect to any claim involving the bankrupt, that the provision of the Corporate Securities Act under consideration gives a creditor certain powers, rights and remedies against the bond before bankruptcy, and that it follows that the trustee succeeds to these rights. While it is conceded that the bankrupt, prior to going into bankruptcy, had no right to or interest in any possible recovery on this bond, it is argued that this portion of the bankruptcy act goes beyond the rights previously held by the bankrupt and gives to the trustee any rights which may have accrued to any creditor of the bankrupt. The appellant attempts to distinguish the right to recover under this bond from other cases involving individual contractual rights held by particular secured creditors which admittedly do not pass to the trustee. It is argued that the right to recover under this bond is created by law and not by contract, and that this is not an individual right but a right held in common by all members of a certain class.

While the law has led to the giving of this bond, the bond itself is a contract, and the right of a person entitled to claim thereunder is created by contract and is an individual right given to any person for whose benefit the contract was made. In our opinion, this is a definite contractual right given to each person coming within the provisions of the bond, and the same is not a right in common given to a collective and unidentified group.

In discussing the effect of the above provision of the Bankruptcy Act, Gilbert's Collier on Bankruptcy, second edition, page 733, says:

" . . . as to property not in the custody of the court, that the trustee shall stand in the position of a judgment creditor holding an execution returned unsatisfied, entitles him to proceed against the assets in the same manner as a judgment creditor. It was to obviate the prior limitation upon the right of a trustee to attack unrecorded conditional sales contracts and other like liens, that the amendment was passed. The purpose of the amendment was to give to the trustee the rights of a lien or judgment creditor, thereby enabling him to protect general creditors from unrecorded liens, unlawful transfers, spurious claims and other dissipations of the assets of the estate, which a lien or judgment creditor might have prevented had bankruptcy not intervened."

In volume 7 of Corpus Juris, at page 114, it is said:

"Accordingly the title of the trustee is not limited to property which belongs absolutely to the bankrupt, but also extends to property which, by reason of state statutes, is considered as belonging to him as far as the rights of his creditors are concerned, or in which he has a transferable interest."

The discussion of this provision of the Bankruptcy Act, to be found in Collier on Bankruptcy, thirteenth edition, volume 2, pages 1053 to 1058, includes the following:

"The purpose of the amendment was to give to the trustee the rights of a lien or judgment creditor, enabling him to protect general creditors from unrecorded liens, unlawful transfers, spurious claims and other dissipations of the assets of the estate, which a lien or judgment creditor might have prevented had bankruptcy not intervened. The class of cases, unprovided for by the original act, and intended to be reached by the amendment, was that in which no creditors had acquired liens by legal or equitable proceedings and to vest in the trustee for the interest of all creditors the potential rights of creditors potential with such liens."

The Corporate Securities Act and a bond given in pursuance thereof give to one coming within their provisions a definite contractual right to recover on the bond. Such a right is neither directly nor indirectly a part of the assets

of the bankruptcy estate, and we think this provision of the Bankruptcy Act was not intended to cover such a claim and that a recovery on such a bond is not within its terms, express or implied. Under the terms of the Corporate Securities Act any recovery on the bond is the property of a particular claimant whose position is somewhat analogous to that of one holding a mechanic's lien or any of the other liens which are not affected by the bankruptcy of the original debtor. In so far as this appeal is concerned, we find no error in the judgment.

That part of the judgment which denies recovery to the plaintiff in intervention is affirmed. That part of the judgment which is in favor of the plaintiff and cross-complainants is reversed, with instructions to the trial court to enter judgment in favor of the defendant sureties as against the plaintiff Betzer and the cross-complainant Olney, and in favor of the cross-complainant Dorrance as against the defendant sureties, in accordance with the views herein expressed.

Marks, J., and Jennings, J., concurred.

A petition by appellants and respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 13, 1936.